UNITED STATES of America,
Plaintiff-Appellee,

v.

William Donald SHEPHERD and Barbara Shepherd, formerly known as Barbara Richard, Defendants-Appellants.

No. 74–1176.

United States Court of Appeals,
Fifth Circuit.

April 14, 1975.

Rehearing and Rehearing En Banc
Denied May 23, 1975.

Stuart Nelkin, Houston, Tex., for defendants-appellants.

Anthony J. P. Farris, U. S. Atty., Edward B. McDonough, Jr., Alvin A. Horne, James R. Gough, Asst. U. S. Attys., Houston, Tex., for plaintiff-appellee.

Before DYER, MORGAN and GEE, Circuit Judges.

DYER, Circuit Judge:

Donald Shepherd was convicted on fifteen counts of mail fraud in violation of 18 U.S.C.A. § 1341. His wife, Barbara Shepherd, was convicted of aiding and abetting the mail fraud. Both were convicted of an additional count of transporting a fraudulently obtained security in interstate commerce in violation of 18 U.S.C.A. § 2314. Their primary assertions of error are twofold. They urge reversal of the mail fraud convictions on the ground that the use of the mails was not "for the purpose of executing the fraudulent scheme" as required by the mail fraud statute. They also contend that the violation of their Sixth Amendment right to a speedy trial requires reversal of the convictions under both statutes. We disagree and affirm.

The fraudulent scheme involved "check kiting," by which Shepherd, who was financially overextended, was able to obtain "forced credit." This was accomplished by having various persons write checks drawn on closed accounts or accounts containing insufficient funds payable in most instances to Houston Aircraft Brokers, Inc. (HAB), a corporation owned and controlled by Shepherd.[1] These checks were deposited in The Southern State Bank of South Houston, Texas, to the account of HAB, which obtained immediate credit for these deposits.[2]

When the worthless checks were dishonored and charged back, Shepherd covered the resulting deficit by deposits of additional worthless checks. The size of the overdrafts and deposits accelerated until The Southern State Bank ultimately realized a net loss of more than $600,000.

## JURISDICTION

Shepherd caused the mails to be used by the payor banks to transmit the various worthless checks to the drawee banks in the check collection process. The Shepherds do not dispute this but argue that since the use of the mails was

---

1. Eleven of the first sixteen counts involved checks payable to HAB and drawn on the accounts of persons other than Shepherd. The check involved in count fourteen was payable to HAB, but was drawn on Shepherd's account. The checks involved in counts five and eight were payable to Shepherd, and the check in count ten was payable to W. C. Marshall and Co., Shepherd's accountant. The check involved in count thir-

teen was payable to The Southern State Bank.

2. Count sixteen arose out of the deposit in the Sugarland State Bank of Jeanerette, Louisiana, of worthless drafts drawn on the Bank of Sark of Great Britain, in exchange for cashiers checks which were then deposited to the account of HAB in The Southern State Bank.

only an incidental result of the fraudulent scheme it was not within the mail fraud statute. The government, on the other hand, urges that the use of the mails was an integral part of the fraudulent scheme, and thus within the jurisdictional ambit of the district court. We agree.

The Shepherds rely on United States v. Maze, 1974, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603; Parr v. United States, 1960, 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277; and Kann v. United States, 1944, 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88, to support the attack on their convictions. *Maze* set out a two-pronged test to determine the existence of jurisdiction. A fraudulent scheme will constitute a federal crime if the defendant "causes" the mails to be used, and the mailings are "sufficiently closely related" to the scheme. *Id.* 414 U.S. at 399, 94 S.Ct. 645, 38 L.Ed.2d 603.

■ The first prong of this test is clearly satisfied here. As the Court pointed out in Pereira v. United States, 1954, 347 U.S. 1, 9, 74 S.Ct. 358, 98 L.Ed. 435, and recognized in *Maze*, it is not necessary that the defendant himself place the matter into a mail depository, only that he have a reasonable basis to foresee that the mails will be used. It is apparent that the Shepherds knew that the mails would be used in the check collection process.

■ Our task, therefore, is to determine whether the mailings in this case are "sufficiently closely related" to the fraudulent scheme. To satisfy this test the mailing must be "for the purpose of executing the scheme," *Kann, supra,* 323 U.S. at 94, 65 S.Ct. at 151; but "[i]t is not necessary that the scheme contemplate the use of the mails as an essential element." *Pereira, supra,* 347 U.S. at 8, 74 S.Ct. at 362. What is crucial is that the mailing be "incident to an essential part of the scheme." *Id.*

Both *Maze* and *Parr* involved the fraudulent use of credit cards. The government asserted that the mailing of invoices subsequent to fraudulent purchases was sufficient to invoke jurisdiction under the mail fraud statute. The Supreme Court rejected the government's position since the fraud had been completed upon the use of the credit cards, when the goods and services had been irrevocably received and the fraudulent scheme had thus reached fruition by the time the mails were used. The mails were not utilized to further the scheme.

Similar to *Maze* and *Parr*, but closer factually to the case at hand is *Kann* which involved the cashing of fraudulent checks rather than the fraudulent use of credit cards. In *Kann,* corporate officers set up a dummy corporation to divert profits from the corporation for which they acted in order to pay themselves additional compensation without rendering services. The officers had the dummy corporation issue checks in their names and cashed the checks. The use of the mails was in the check collection process. The mailings were held to be insufficient to establish jurisdiction. The Court stressed the fact that the scheme had reached fruition upon the cashing of the checks, since the "persons intended to receive the money had received it irrevocably," and therefore "the subsequent banking transactions between the banks concerned were merely incidental and collateral to the scheme and not a part of it." *Id.,* 323 U.S. at 94, 95, 65 S.Ct. at 151.

In this case Shepherd did not intend to *irrevocably* receive the money he fraudulently obtained. The purpose of the scheme was to obtain, for a significant period of time, "forced credit," which he ultimately might repay. The scheme had not reached fruition, but was ongoing.

It was deemed significant in *Kann* that "[i]t was immaterial to [defendants], or to any consummation of the scheme, how the bank which paid or credited the check would collect from the drawee bank." *Id.,* 323 U.S. at 94, 65 S.Ct. at 151. Shepherd's scheme, on the other hand, uniquely depended upon the check collection process. It was the *delay* that enabled Shepherd to receive the

forced credit, and it was the *use of the mails* that caused the delay.

*Kann* carefully distinguished its particular fact situation from the factual situation *sub judice* "where the use of the mails is a means of concealment so that further frauds which are part of the scheme may be perpetrated." *Id.,* 323 U.S. at 94–95, 65 S.Ct. at 151.[3] We have recently recognized this distinction in United States v. Constant, 5 Cir. 1974, 501 F.2d 1284. There the defendant maintained checking accounts in New Jersey and Florida banks. He would draw a check on the New Jersey account, which contained insufficient funds to cover the check, and immediately depart for Florida to deposit the check in his Florida account. He would then draw a check on the Florida account to deposit in the New Jersey account in order to cover the deficit he created in that account. This practice continued with the amounts of the checks accelerating.

The defendant in *Constant,* relying on *Maze,* argued that the scheme had reached fruition when the depository bank credited defendant's account upon the deposit of a worthless check. This Court, however, distinguished *Maze* because the delay which was encountered by the mailing "was a central element" in the scheme. *Id.* at 1291 of 501 F.2d.

As in *Constant,* the use of the mails by Shepherd was a central element in the scheme. Shepherd's receipt of forced credit involved a series of deposits of worthless checks to cover the dishonor of prior worthless checks. Consequently, not only did he obtain forced credit during the collection process of the initial checks deposited, but he was able to extend this credit by subsequent deposits of worthless checks. The delay caused by the mails was therefore doubly crucial.

■ It is thus clear that the use of the mails in this case was "incidental to an essential element of the scheme" and

was therefore "for the purpose of executing the fraudulent scheme" as required by the mail fraud statute.

## RIGHT TO A SPEEDY TRIAL

■ The guidelines to determine whether an indictment must be dismissed as a result of the violation of a defendant's right to a speedy trial were drawn in Barker v. Wingo, 1972, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101. Four factors are to be weighed in a delicate balancing test to make this determination: (1) length of delay, (2) reasons for the delay, (3) the strength and frequency of a defendant's assertion of his right, and (4) prejudice to the defendant.

Length of delay is "to some extent a triggering mechanism." *Barker, supra* at 530, 92 S.Ct. at 2192. There must be a showing of some delay which is presumptively prejudicial before the necessity to inquire into the other factors arises. The delay from indictment to trial, excluding a two month delay requested by defendants due to Barbara Shepherd's ill health, was approximately one year and nine months. This time elapse triggers the need to seriously consider the Shepherds' claim. Arrant v. Wainwright, 5 Cir. 1972, 468 F.2d 677.

Under *Barker,* neutral factors causing the delay are to be weighed less heavily against the government than an attempt by the government to prejudice the defense by delay. It is undisputed that the delay in this case resulted from the action or inaction of the district court rather than from any action, much less misconduct, of the prosecution. We therefore assign little weight to this factor in assessing the Shepherds' claim.

Although *Barker* rejected the "demand rule," the frequency and strength of a defendant's assertion of his right to a speedy trial is a crucial factor to be considered in the balancing test. "We emphasize that failure to assert the right will make it difficult for a defendant to

---

**3.** The Court cited with approval United States v. Lowe, 7 Cir. 1941, 115 F.2d 596, which involved a check kiting scheme similar to that involved here.

prove that he was denied a speedy trial," since "[t]he more serious the deprivation, the more likely a defendant is to complain." *Id.*, 407 U.S. at 531–32, 92 S.Ct. at 2192. The Shepherds made no demand for a speedy trial. Their first and only motion for dismissal for denial of a speedy trial came fourteen days before the date set for trial. Defendants attempt to explain the absence of demand by suggesting that since the district court delayed ruling on their discovery motions, they were unable to prepare for trial and consequently were in no position to make a demand. We are unpersuaded. Defendants could have demanded prompt action on their discovery motions and asserted their right to a speedy trial as the basis for their request. Defendants' complacence with respect to this crucial factor weighs heavily against their claim.

*Barker,* identified three separate interests which fall within the general category of prejudice: oppressive pretrial incarceration, anxiety and concern of the accused, and impairment of the defense of the accused. Neither Barbara nor Donald Shepherd was burdened with pretrial incarceration.

In *Arrant, supra,* we said that anxiety is present to some degree in virtually every case. Something more than the normal anxiety that accompanies a trial is necessary to show a degree of prejudice. At the time of his indictment Shepherd's assets were in the hands of a Trustee in Bankruptcy, and his net worth had plunged from two million dollars to five thousand dollars, which was in the registry of the court. The delay from · indictment to trial contributed nothing to his financial misfortunes and any anxiety that might have resulted therefrom. There likewise is no indication that Barbara Shepherd's physical problems were occasioned by the delay, rather than by the fact of the trial itself or by Shepherd's financial downfall.

The Shepherds argue that the delay between indictment and trial seriously hampered their defense by the inability to locate material witnesses, the faded memories of witnesses, and the loss or disappearance of relevant business records.

Defendants included in their motion to dismiss for denial of a speedy trial a list of eighteen witnesses whose testimony they allege they would have obtained had they received a speedy trial.[4] Defendants transmitted this list to the government, which aided defendants in attempting to locate the witnesses through the FBI and issued subpoenas at no charge to the defense. Despite the fact that defendants were admittedly "a little lax" in not providing the prosecution this list at an earlier time, defendants now point to only four witnesses that were not present at the trial—Habarta, Webster, McBride, and Grayson.

The government located Habarta's residence and learned that he was on a business trip at the time. Defendants' inability to produce him was not the result of any delay in the trial. Webster was over eighty years old and, due to a heart condition, was not present at trial to testify. His testimony would have been merely cumulative to that of his son. McBride could not be found by the government. Nor does it appear that defense counsel had ever been in contact with McBride, or that McBride could have been located at an earlier time. Furthermore, McBride's anticipated testimony would have been collateral to any disputed issue, and for the most part cumulative of other evidence. Grayson was a heart patient and was unable to travel to testify at the time of the trial. No showing was made of Grayson's expected testimony or that it would have been material. Defense counsel was permitted to submit written interrogatories to Grayson, but there is no explanation for the failure of these interrogatories to

---

4. Defendants did not know whether they could have obtained the testimony of these witnesses, since admittedly they had been in

contact with only "some" of the witnesses at any time during the proceeding.

surface at trial. We find no merit to the defendants' claim of inability to locate material witnesses due to delay.

Defendants' attempt to demonstrate that the memories of a number of witnesses had faded due to the delay is not persuasive. We perceive no more than the general inability to recall a transaction with the desired specificity that occurs in any trial regardless of delay. The faded memories do not appear to relate substantially to any material fact in issue. Finally, such loss of memory as occurred enured to defendants' benefit, since the witnesses whose memory had been allegedly impaired were government witnesses.

Finally, Shepherd asserts that business records which he needed to adequately prepare for trial had disappeared or been lost due to the delay. They had been turned over to a Trustee in Bankruptcy nearly a year prior to the mail fraud indictment. It is not clear how the mere lapse of time could have caused the loss of these records. In any event, we cannot determine the materiality of the missing records since no explanation was provided by the Shepherds as to what subject matter the records were to cover or even what types of records were lost.

■ Shepherd's testimony concerning the missing records was undoubtedly elicited to persuade the jury that he was testifying from memory alone, and that the records would have in some way aided the testimony he was giving. In the

absence of a clearer showing of what types of records were lost and how they might have had a material bearing on the defendants' guilt or innocence, we cannot say their loss was prejudicial.[5]

■ The failure to show any prejudice that might have been occasioned by a delay in bringing the Shepherds to trial combined with the neutral reasons for the delay and the complacency of the defendants in failing to demand at any time a right to a speedy trial require rejection of the Shepherds' claim.[6]

We have carefully examined defendants' other assertions of error and find them to be without merit.

Affirmed.

---

5. We note in passing that Shepherd's accountant, whom he was permitted to have as a debtor in possession, at one time had access to the various documents and actually had a number of them in his possession.

6. For the first time on appeal the Shepherds also urge us to reverse their convictions and to dismiss the indictments because of the violation of the Plan of the United States District Court for the Southern District of Texas for Achieving Prompt Disposition of Criminal Cases, promulgated pursuant to Rule 50(b) of the Federal Rules of Criminal Procedure. The Plan was filed on March 9, 1973. On April 20, 1973, the district court ruled upon all pending motions. Trial was set for August 4, 1973, but was continued to October 4, 1973,

because of the illness of one of the defendants.

While there was a delay of two months over the 90 days provided in the Plan, we must take cognizance that the remedial requirements of the Plan were new and that "busy districts [the Southern District of Texas had the heaviest pending workload at that time of any district in this Circuit] may find it difficult to operate under them impeccably." United States v. Rodriguez, 5 Cir. 1974, 497 F.2d 172, 176. While we do not condone the delay beyond the time limit provided in the Plan, it is not so egregious, considering the complexity of the issues to be tried and that the plan had so recently become effective, that "the *public interest* in the quick, efficient functioning of the criminal justice process" has been aborted. *Id.* at 175.