UNITED STATES of America,
Plaintiff-Appellee,

v.

Thomas Norwood STREET, Jr.,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Gordon Byron FERGUSON,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Louis Hobson DICKINSON,
Defendant-Appellant.

No. 75–1629 to 75–1631.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 3, 1975.

Decided Feb. 10, 1976.

James S. Cox, Krivcher & Cox, Memphis, Tenn., for Thomas Norwood Street, Jr.

Thomas F. Turley, Jr., U. S. Atty., W. Hickman Ewing, Jr., Asst. U. S. Atty., Memphis, Tenn., for the United States.

Alvin M. Binder, Jackson, Miss., for Gordon Byron Ferguson.

Edward G. Grogan, Heiskell, Donelson, Adams, Williams & Wall, Memphis, Tenn., for Louis Hobson Dickinson.

Before PHILLIPS, Chief Judge, and MILLER and LIVELY, Circuit Judges.

PHILLIPS, Chief Judge.

This appeal presents the question of whether a "check kiting" scheme as perpetrated by defendants-appellants vi-olates the federal mail fraud statute, 18 U.S.C. § 1341.[1]

Ferguson, Dickinson and Street were found guilty by the jury on five counts of mail fraud and sentenced by District Judge Robert McRae, Jr., to imprisonment of one year and one day on each count, to run concurrently. We affirm.

The three defendant-appellants were officers in National Securities Corporation (NSC), a corporation organized in March 1969 for the purpose of buying, selling, and underwriting bonds. The company headquarters were in Jackson, Mississippi, with sales offices in Memphis, Tennessee, and Meridian, Mississippi. Bank accounts were opened by NSC with First National Bank of Jackson, Mississippi, First National Bank of Meridian, Mississippi, Union Planters National Bank of Memphis, Tennessee and Deposit Guaranty National Bank of Jackson, Mississippi.

In March 1969, Ferguson opened an account with the Memphis Bank and Trust Company in the name of the First National Bank of Meridian, in which Ferguson was a major stockholder and director. NSC deposited checks with Memphis Bank and Trust to be credited to the First National Meridian account. First National was notified by telephone or wire at the end of each day as to the specific amount deposited in the Memphis Bank and Trust account. The checks then were cleared through the Federal Reserve Bank in New Orleans in accordance with usual bank procedures. There is no dispute that the United States mail was used in the collection process.

---

1. § 1341. Frauds and swindles

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

Pursuant to instructions given by Street, a bookkeeper for NSC began making systematic transfers of funds between four banks used by the corporation. The transfers were between (1) First National Bank of Meridian, (2) Union Planters Bank of Memphis, (3) First National Bank of Jackson and (4) Memphis Bank & Trust. They were in even dollar amounts starting with $35,000 on Monday and increasing each day by $5,000 until Friday, when the transfers totaled $55,000 to each bank. Transfer of funds in this "round robin" fashion created an illusion that NSC had substantially higher cash balances in each of the banks than was factually true. Essential to the success of such a check kiting scheme is the delay caused in the bank collection process through use of the mails. By taking advantage of the "float time" generated by the repeated transfers of funds, NSC was able to present an inflated picture of financial resources by which credit could be obtained on the basis of nonexistent cash assets. At the time when the scheme finally was halted, checks then in process of being floated caused the corporate accounts of NSC to be overdrawn by approximately $245,000.

Count I was a broad indictment covering the scheme in its entirety. Counts V, VI, VII and VIII involved specific checks transferred between Memphis Bank & Trust Co. and the First National Bank of Meridian. The transfers involved under Counts V, VI, VII and VIII were confirmed by telephone or wire prior to the normal bank confirmation procedure.

Appellants contend that these activities are not within the purview of 18 U.S.C. § 1341, and, therefore, the District Court and this court are without jurisdiction. We conclude that the conduct of defendants falls within the scope of § 1341.

The Supreme Court has stated that "the elements of the offense of mail fraud under 18 U.S.C. § 1341 are (1) a scheme to defraud and (2) the mailing of a letter, etc., for the purpose of executing the scheme." *Pereira v. United States,* 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954). Once a scheme has been established, "it is not necessary that the scheme contemplate the use of the mails as an essential element" so long as the mailing is "incident to an essential part of the scheme." *Id.*

The element of causation is satisfied "where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can usually be foreseen, even though not actually intended." *Id.* at 8–9, 74 S.Ct. at 363.

The Supreme Court also has said:

The federal mail fraud statute does not purport to reach all frauds, but only those limited instances in which the use of the mails is a part of the execution of the fraud, leaving all other cases to be dealt with by appropriate state law. *Kann v. United States,* 323 U.S. 88, 95, 65 S.Ct. 148, 151, 89 L.Ed. 88 (1944).

The recent decision in *United States v. Maze,* 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974) sets forth the Court's criteria for activity in violation of § 1341. The Court stated that the "more difficult question is whether these mailings were *sufficiently closely related* to respondent's scheme to bring his conduct within the statute." 414 U.S. at 399, 94 S.Ct. at 648 (Emphasis supplied.) *Maze* involved the use of a stolen credit card, an act necessarily requiring the return of the sales slip by mail to the banks for verification and payment. The *Maze* court used several limiting phrases in defining the scope of the statute. Since the objective of the statute is to outlaw the use of the mails for the purpose of executing an unlawful scheme, the Court concluded that such mailings must play a significant part in the furtherance of the scheme. Additionally, the scheme must not have "reached fruition" prior to the use of the mails. The mere "adjusting of accounts" between victims of the scheme would not bring § 1341 into play. The Court noted that the fact that the mailings "increased the probability that

the respondent would be detected and apprehended" was to be considered important in any case brought under § 1341. 414 U.S. at 403, 94 S.Ct. at 650.

In *U. S. v. Hopkins*, 357 F.2d 14, 16, 17 (6th Cir. 1966), *cert. denied*, 385 U.S. 858, 87 S.Ct. 107, 17 L.Ed.2d 84 (1966), this court said:

> The Court recognizes the rule of the *Parr [Parr v. United States*, 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277] and *Kann* cases, as exemplified by other lower court decisions cited by defendant's counsel, that the use of the mails must be a step in the execution of the scheme charged in the indictment, and not incidental thereto, in order to constitute an element of the offense under § 1341.

> \* \* \* \* \* \*

> It is not necessary that the false representations were themselves transmitted by mail. It is sufficient that the use of the mails was caused by the defendant in furtherance of the fraudulent scheme. *United States v. Sorce*, 308 F.2d 299 (C.A. 4, 1962), cert. den., 377 U.S. 957, 84 S.Ct. 1635, 12 L.Ed.2d 500 (1964).

The determinative issue in the present case is whether a "check kiting" scheme such as that perpetrated by appellants falls within the scope of § 1341 as proscribed by *Maze, Kann, Periera and Hopkins.*

As said by then Circuit Judge Blackmun in *United States v. Gross*, 416 F.2d 1205, 1212 (8th Cir. 1969), *cert. denied*, 397 U.S. 1013, 90 S.Ct. 1245, 25 L.Ed.2d 427 (1970): "It is established that check kiting is within the reach of the fraud statutes."

"Check kiting" is defined as follows in *United States v. Giordano*, 489 F.2d 327, 329 (2d Cir. 1973):

> "Kiting" occurs when accounts are maintained in different banks and checks are drawn on one account and deposited in the other when neither account has any substantial funds in it to pay the checks drawn on it. Since it takes several days to collect a check,

each of the accounts will show substantial credits of uncollected checks, and those credits will continue so long as checks continue to be drawn every day in each bank and deposited in the other bank. If some checks are drawn to cash or to legitimate third parties, the checks that flow between the two banks have to be increased to maintain the "kiting" equilibrium.

*See also United States v. Constant*, 501 F.2d 1284, 1291 (5th Cir. 1974), *cert. denied*, 420 U.S. 910, 95 S.Ct. 830, 42 L.Ed.2d 840 (1975):

> This collection was made possible by the bank's procedure of clearing checks through the mail. . . .
> The use of the mails in achieving this result is sufficient to make Constant's conduct punishable under 18 U.S.C. § 1341.

*United States v. Strauss*, 452 F.2d 375, 380 (7th Cir. 1971), *cert. denied*, 405 U.S. 989, 92 S.Ct. 1252, 31 L.Ed.2d 455 (1972): "[T]he use of the mails 'caused' by the defendant provided or contributed to a time lag which was intended to aid in avoiding detection."; *United States v. Hendrickson*, 394 F.2d 807, 809 (6th Cir. 1968): "[T]his return by mail contributed to the time interval for cashing checks which appellant and his accomplices sought. It was an integral part of the fraudulent scheme."

The recent case of *United States v. Shepherd*, 511 F.2d 119 (5th Cir. 1975), involved a check kiting scheme used by financially overextended defendants to obtain "forced credit" from financial institutions. The eventual loss totaled more than $600,000. In concluding that such a scheme fell within the mail fraud statute, the court distinguished *Maze* on several grounds: First, "the scheme had not reached fruition but was ongoing." 511 F.2d at 121. Secondly, the scheme "uniquely depended upon the check collection process. It was the *delay* that enabled Sheperd to receive the forced credit, and it was the *use of the mails* that caused the delay." (Emphasis in original.) *Id.* at 121–22. The court stated that "the use of the mails by Sheperd

was a central element in the scheme" and concluded that: "It is thus clear that the use of the mails in this case was 'incidental to an essential element of the scheme' and was therefore 'for the purpose of executing the fraudulent scheme' as required by the mail fraud statute." 511 F.2d at 122.

We hold that the evidence in the present case is sufficient to sustain the convictions on all counts. Count I sets out a scheme in which the use of the mails is a "central element" to its overall success. The delays inherent in the bank collection process enabled NSC to present a distorted picture of financial prowess, and when eventually detected, resulted in substantial overdrafts. The avoidance of detection is of importance in any § 1341 violation. Counts I, V, VI, VII and VIII all present circumstances which would have led to early detection had it not been for use of the mail. The banks were "lulled into a false sense of security" by delays due to float time. Although the use of the mails in Counts V through VIII may not have been a central element in completion of the scheme, we conclude that it was an essential element in avoidance of detection. We, therefore, find appellants' contentions to be without merit.

Dickinson asserts that no substantial evidence was presented to support his conviction. He was President of the corporation and signed many of the checks involved in the scheme. We find that there was sufficient evidence from which the jury could have concluded, as it did, that Dickinson, and the other two defendants-appellants, were guilty beyond a reasonable doubt.

The judgment of the District Court is affirmed.