**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**N. Eddie MONTGOMERY,
Defendant–Appellant.**

**No. 91–6056.**

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 13, 1992.
Decided Nov. 24, 1992.

Wendy Goggin, Asst. U.S. Atty. (argued and briefed) Ernest W. Williams, U.S. Atty., Nashville, Tenn., for plaintiff-appellee.

William R. Willis, Jr., Willis & Knight, Nashville, Tenn. (argued and briefed), for defendant-appellant.

* The Honorable John W. Potter, United States District Judge for the Northern District of Ohio, sitting by designation.

Before: KENNEDY and MILBURN, Circuit Judges; and POTTER, Senior District Judge.*

KENNEDY, Circuit Judge.

Defendant N. Eddie Montgomery appeals his conviction of executing a scheme with intent to defraud Sovran Bank by "check kiting" and mail fraud. The defendant asserts that the District Court erred in its instruction to the jury concerning the appropriate definition of check kiting. The defendant also argues that the District Court erred in denying defendant's motion for judgment of acquittal on the mail fraud counts, and in other instructions on those counts. For the following reasons, we AFFIRM.

I.

Defendant was a licensed attorney practicing in the field of real estate law since 1978. In January 1983, Defendant contracted with Stewart Title Insurance Company to be its agent for issuing title insurance policies to homebuyers and mortgage companies. That relationship continued until May 1988. Pursuant to the terms of their agreement, defendant was required to maintain a balanced escrow account to hold funds deposited with him by clients of his real estate closing firm. These funds represented money paid to defendant by homebuyers and mortgage companies for the closing of real estate transactions. The funds were to be used to pay off any existing liens on the property being purchased and for other closing costs, as well as to pay the sellers for the property. The real estate escrow account was kept at Sovran Bank Central South in Nashville, Tennessee.

As agent for Stewart Title, defendant was authorized to issue title insurance commitments and policies. The title commitments were issued by defendant before closing and would enumerate the outstanding liens on the property. These title commitments indicated that prior liens would

have to be paid and released before title policies would be issued by defendant (on behalf of Stewart Title). After the deposit of purchase money funds into the defendant's escrow account and the closing of real estate transactions, title insurance policies, written on Stewart Title, would be issued by defendant to the purchasers and mortgage companies. These title insurance policies guaranteed that the homebuyers had clear title to their property and that all prior liens had been satisfied. It was stipulated at trial that the title policies involved in each of the mail fraud counts of the indictment had been mailed through the United States mails to the policy holder.

In 1985, defendant started a business called Southland Properties of which he was a two-thirds owner. The business of Southland Properties was to syndicate real estate and other projects through limited partnerships and to engage in real estate development. Between 1985 and 1988, Southland Properties was involved in the purchase and development of several large tracts. To help Southland Properties fund these transactions, checks were written to Southland out of defendant's escrow account.

Because defendant was withdrawing money from his real estate escrow account for this improper and extraneous purpose, that account began experiencing shortages. To cover these shortages, defendant would hold the checks written to pay off lienholders. In many cases the payoff checks were never mailed and, consequently, prior encumbrances were never extinguished. Despite holding payoff checks and failing to clear title, defendant continued to issue and mail title insurance policies to purchasers and their mortgage companies. These policies insured clear title to the purchased property when, in fact, prior liens had not been released, thus putting Stewart Title at risk. To cover the deficiencies in this real estate account, defendant began depositing into the account checks from various other bank accounts in excess of the balances in those accounts.

On April 18, 1988, defendant opened an account at Sovran Bank under the name Southland Escrow Services with a deposit of $500,000 representing the proceeds of a loan from Sovran. At this time defendant also had an account at Metropolitan Federal Savings and Loan Association under the name of Lakeside Partners.[1]

Defendant then engaged in the following course of action: on April 25, 1988, six days after the Southland Escrow account was opened, checks totaling $1,154,272.50 were drawn on that account payable to Lakeside Partners and deposited into the Lakeside Partners account at Metropolitan Federal.[2] On April 27, 1988, the defendant deposited a total of $1.6 million into the Southland Escrow account at Sovran Bank. Included in this deposit were checks totaling $1,372,716.52 from the Lakeside Partners account at Metropolitan Federal. On the next day, defendant deposited a total of $2,780,023.49 into the Southland Escrow account. Included in this deposit were three checks drawn on the Lakeside Partnership account totaling $1,507,377.24. Checks were also written between other accounts defendant had at Sovran Bank. When officials at Metropolitan Federal became suspicious that such large checks were being deposited back and forth between the account at Sovran Bank and the account at their bank, they froze the Metropolitan Federal account. As a result, the Sovran Bank checks were returned for insufficient funds and Sovran Bank sustained a substantial loss.

Defendant was charged by a grand jury with knowingly executing a scheme and artifice to defraud Sovran Bank and Metropolitan Federal by "kiting" checks between the two banks, "that is, by exchanging checks, unsupported by actual funds, between an account in Sovran Bank ... and an account at Metropolitan Federal ..., and drawing against the unsupported deposits," in violation of 18 U.S.C. §§ 1344

---

1. Lakeside Partners was a partnership between defendant and a man named Phil Stinson. The two were also partners in Southland Properties.

2. The indictment alleged check kiting in April and May, 1988.

and 2. Defendant was also charged with thirty-one counts of mail fraud in violation of 18 U.S.C. §§ 1341 and 2. Three of the mail fraud counts were dismissed prior to trial. The jury found the defendant guilty on the charge of bank fraud as well as on the remaining twenty-nine counts of mail fraud. Defendant has appealed, claiming that the District Court erred in its jury instructions, and erred in failing to direct a verdict of acquittal on the mail fraud charge.

## II.

The defendant argues that the trial court erred in admitting expert testimony giving various definitions of check kiting that differed from the definitions set forth in both the indictment and set forth in the case of *United States v. Street*, 529 F.2d 226 (6th Cir.1976); and that the court compounded this error by failing to give the jury defendant's proposed instruction on the definition of "check kiting."

Throughout the course of the trial several definitions of "check kiting" were offered by witnesses for the government and were admitted into evidence over the objections of the defendant. LeRoy Wolfe, a Certified Public Accountant and partner at Deloite & Touche, testified that kiting was "a method whereby a depositor takes advantage of and utilizes the time it takes a check to clear the bank in order to obtain an unauthorized loan."

Similarly, Hal Bishop, a Senior Vice President at Sovran Bank, testified as follows:

Well, a check kite bears the characteristics of having deposits into the bank and almost equivalent withdrawals on the same day recovering the activity by making other deposits. You look to see where those checks come from and if they come from say Third National Bank into your account and the subsequent check going back to Third National Bank, you have all the evidence of a kiting.

Mr. Bishop also explained the bank's written policy on check kiting, reading to the jury the part of that policy stating the characteristics of check kiting:

Typical characteristics of a kite operation include but are not limited to: a) approximate equal daily or cycle to date dollar debits and credits, b) low average daily balances compared to total deposit level, c) repetitive drawings against today's deposits or negative collected funds, d) repetitive similar dollar debits and credits involving one other party, including the second account of the kite suspect, and e) physical items where the depositor, drawer and endorser are the same entity.

Mr. Bishop went on to testify that the definition of a "kite" is:

[A] scheme created by an individual or individuals using two or more accounts whereby they deposit into one account checks drawn on the other one and then subsequently redeposit in the second account checks drawn on the first to cover the check they deposited in the first account.

In addition, Phillip Elam, an officer of Metropolitan Federal, gave the following definition of a check kite:

When you open a checking account, and you deposit a check into it, and that check is not good, and it is sent back by the bank that it's drawn on as uncollected, on a continuing basis, that's part of what's termed kiting. In other words, you're making a deposit with checks that are not good.

The defendant contends that it was improper for the District Court to allow these witnesses to testify about what constitutes check kiting as a matter of law. A trial court's decision to allow an expert to testify on a given matter will not be disturbed absent an abuse of discretion. *Molecular Technology Corp. v. Valentine*, 925 F.2d 910, 919 (6th Cir.1991) (citing *Davis v. Combustion Engineering, Inc.*, 742 F.2d 916, 919 (6th Cir.1984)). Here, where the expert testimony was closely related to the element of the crime of check kiting, we must also keep in mind that this Court has repeatedly held that it is impermissible for a trial judge to delegate his

duty to determine the law of a case to an expert. *Id.* at 919.

■ During LeRoy Wolfe's testimony concerning the definition of check kiting, the District Court instructed the jury that:

I will tell you what the definition [of check kiting] is. You can listen to this man's testimony what he thinks it is and just listen to Mr. Willis or anybody else. I will tell you at the end of the trial what it is when I charge the law.

When Mr. Wolfe later testified that he determined defendant was participating in a scheme referred to as a kite, the judge told the jury: "It is this witness' opinion ... based upon his experience in the banking business and expertise. He is authorized to express that opinion. It is up to you whether or not to believe him."

■ The District Judge let the jury know that these witnesses were testifying as to their opinions about what check kiting is and how they believe it works. He also made it clear to the jury that these witnesses were not giving legal opinions when he informed the jury that he would be giving them the definition of check kiting when he instructed them. Thus, we find that the District Court did not abuse its discretion in admitting the testimony. Assuming that the introduction into evidence of the improper expert testimony was error, it is subject to the "harmless error" rule. Fed. R.Crim.P. 52.[3] The harmless error rule applies to the admission of the check kiting testimony whether the government witnesses are considered experts or not. The experts' descriptions were essentially the same as the definition given in the court's instructions.

Defendant also argues that the District Court erred in failing to give the definition of check kiting found in *Street.* Defendant's proposed instruction read:

[Check kiting is defined as having occurred] when accounts are maintained in different banks and checks are drawn on one account and deposited in the other

when neither account has any substantial funds in it to pay the checks drawn on it. *Street,* 529 F.2d at 229 (quoting *United States v. Giordano,* 489 F.2d 327, 329 (2d Cir.1973)).

The court instead instructed the jury:

The scheme to defraud may take many different forms, one of which is a check kiting scheme. A check kite itself can take many different forms. The kite alleged in the indictment is one version of such a scheme to defraud.

The following is an example of a kiting scheme. An individual writes a check in excess of his account balance in one bank, deposits it in his account in another bank and then reverses the process by writing a check on the second account and depositing it in the first account.

By doing this, the individual artificially inflates the balance in both accounts. By taking advantage of the time period required for the transmittal, processing and payment of checks from accounts in the two banks he uses the provisional credit often referred to by lawyers in this case as uncollected funds which the banks granted when the checks were deposited.

In effect, this provisional extension of credit by one bank allows the individual to play the float and cover a bad check by misleading the second bank into extending him credit on an equally worthless check.

Now, if you find beyond a reasonable doubt that Eddie Montgomery executed such a scheme with the requisite intent to defraud then you must find—then you would find that he executed a scheme or artifice to defraud within the meaning of Section 1344 of Title 18, United States Code.

■ On appeal, jury instructions are reviewed as a whole in order to determine whether they adequately inform the jury of the relevant considerations and provide a basis in law for aiding the jury in reaching its decision. *Kitchen v. Chippewa Valley*

---

**3. Rule 52. Harmless Error and Plain Error**
   **(a) Harmless Error.** Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.

*Schools*, 825 F.2d 1004, 1010–11 (6th Cir. 1987). The defendant's proposed instruction (based on *Street*) and the court's actual instruction are similar in that both described a scheme in which a check is drawn on one account in excess of the balance of collected funds or other good funds in that account and deposited in a second account; then a check drawn on the second account is deposited in the first.

Defendant contends that, unlike the definition given in *Street*, the judge's instruction does not contain the "substantial funds" language. However, a judge does not commit error because he or she fails to use language contained in a request, so long as the instruction given is accurate and sufficient. *United States v. Martin*, 740 F.2d 1352, 1361 (6th Cir.1984) (citations omitted). Defendant argues that *Street* held that the absence of substantial funds is required for criminal check kiting and that so long as an account has substantial funds there can be no kite. Defendant's argument is flawed in that *Street* did not establish an all-inclusive definition of check kiting, but was simply setting forth a definition of check kiting that had previously been articulated by the Second Circuit in *United States v. Giordano*, 489 F.2d 327, 329 (2d Cir.1973), a case where there were "insufficient" funds. Alternatively, the *Street* court may have used "substantial" to mean in relation to the checks written, *i.e.*, funds were in the accounts to cover substantially all the checks written. To say that one can not be guilty of check kiting if he has "substantial funds" in the sense of a substantial dollar amount would permit check kiting so long as it was on a grand scale. We hold that *Street* merely establishes *a* definition of check kiting and not *the* (only) definition of check kiting. We find that the District Court's instruction on the definition of check kiting in this case was "accurate and sufficient."

### III.

The defendant also argues that the District Court erred in denying the defendant's motion for judgment of acquittal because mailing the title policies was not incident to an essential part of a scheme to defraud. Defendant contends that the mailings were not part of the fraudulent scheme against Stewart Title because this scheme was completed when the defendant delivered the title commitments at closing, accepted the premiums, and deposited the money in his escrow account sometimes several weeks before the title policies were mailed. This Court reviews the denial of a motion for acquittal *de novo*, under the standard of "whether, after reviewing all the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt." *United States v. Ingrao*, 844 F.2d 314, 315 (6th Cir.1988) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)).

The elements of the offense of mail fraud under 18 U.S.C. § 1341 are (1) a scheme to defraud, and (2) a mailing for the purpose of executing same. *United States v. Talbott*, 590 F.2d 192 (6th Cir. 1978). In *Schmuck v. United States*, 489 U.S. 705, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989), the Supreme Court stated that "[t]o be part of the execution of the fraud ... the use of the mails need not be an essential element of the scheme. It is sufficient for the mailing to be 'incident to an essential part of the scheme,' or 'a step in [the] plot.'" *Id.* at 710–11, 109 S.Ct. at 1447 (citations omitted) (quoting *Badders v. United States*, 240 U.S. 391, 394, 36 S.Ct. 367, 368, 60 L.Ed. 706 (1916)). In *Schmuck*, the defendant purchased used cars, rolled back their odometers and then sold the automobiles to retail dealers for artificially inflated prices. Schmuck marketed the tampered cars to a number of dealers, mailing those dealers the title-registration papers. The Supreme Court found that:

Schmuck's scheme would have come to an abrupt halt if the dealers either had lost faith in Schmuck or had not been able to resell cars obtained from him. These resales and Schmuck's relationships with the retail dealers naturally depended on the successful passage of title among the various parties. Thus, although the registration-form mailings may not have contributed directly to the

duping of either the retail dealers or the customers, they were necessary to the passage of title, which in turn was essential to the perpetuation of Schmuck's scheme.

*Schmuck,* 489 U.S. at 712, 109 S.Ct. at 1448. Here, the scheme the defendant was charged with was: (1) receiving funds at real estate closings sufficient to pay off the liens to clear title to the subject property; (2) holding on to these funds and thus failing to pay off the liens; (3) mailing final title policies on properties where existing liens had not been paid off. In light of this scheme, a rational jury could have found that mailing the title policies was critical to this scheme, because if the defendant had not issued and mailed the title policies, the homeowners would have questioned whether the prior liens had been paid off, quickly leading to disclosure of the defendant's fraudulent plan.

Similarly, the indictment charged defendant with devising and attempting to devise a scheme to defraud and obtain money not only from Stewart Title, but also from the sellers and purchasers of the real estate and the mortgagees. While it is clear that Stewart Title was the primary victim, these mailings were also "incident to an essential part of the scheme" to defraud the purchasers. The defendant was receiving their money to pay off liens and sending them title policies which purported to convey clear title. Because of the potential difficulties faced by these purchasers (*e.g.,* trying to sell the property without clear title; engaging in a lawsuit against Stewart Title because of the acts of the defendant) they too suffered as a result of defendant's mailing inaccurate title policies.

### IV.

█ Finally, defendant argues that the District Court erred in its instruction to the jury on the mail fraud counts. Defendant contends that it was error for the judge to fail to instruct the jury that there is no

violation of the mail fraud statute if the scheme has "reached fruition" at the time the mail is used.[4] The District Court gave the following instruction: .

It is not necessary for the mailings to be an essential part of the contemplated scheme. All that is required is that the use of the mails must be caused by the defendant in furtherance of the fraudulent scheme.

Because one cannot do an act in furtherance of a scheme when that scheme has already been completed, this instruction, taken as a whole, fairly and adequately submits the issues and applicable law to the jury. *Martin,* 740 F.2d at 1361.

### V.

For the aforementioned reasons, we AFFIRM the decision of the District Court.

**4.** Defendant cites *Kann v. United States,* 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88 (1944); *Parr v. United States,* 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960); and *United States v. Maze,* 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974), for the proposition that where the fraud-

ulent scheme is complete prior to a mailing, the mailing was not sufficiently connected to the scheme to satisfy the mailing prerequisite of 18 U.S.C. § 1341. These cases were all distinguished by the Court in *Schmuck.*