UNITED STATES of America,
Plaintiff-Appellee,

v.

James C. BUCHANAN,
Defendant-Appellant.

No. 75–3749.

United States Court of Appeals,
Fifth Circuit.

Jan. 10, 1977.

Rehearing and Rehearing En Banc Denied
Feb. 14, 1977.

Roland E. Dahlin, II, Federal Public Defender, William W. Burge, Asst. Federal Public Defender, Mike DeGeurin, Juan E. Gavito, Asst. Federal Public Defenders, Houston, Tex., for defendant-appellant.

Edward B. McDonough, Jr., U. S. Atty., Mary L. Sinderson, George A. Kelt, Jr., Asst. U. S. Attys., Houston, Tex., John Patrick Smith, Asst. U. S. Atty., Brownsville, Tex., James R. Gough, Asst. U. S. Atty., Houston, Tex., for plaintiff-appellee.

Before JONES, WISDOM and GODBOLD, Circuit Judges.

GODBOLD, Circuit Judge:

Defendant James C. Buchanan appeals from a jury conviction on seven counts of violating the federal mail fraud statute. 18 U.S.C. § 1341.[1] The district court sentenced Buchanan to three years on each count, the terms to run concurrently.

■ Buchanan's "scheme" involved the creation of Union Postal Systems, Inc., a franchise arrangement whereby interested parties each paid him $1,000 for the opportunity to deliver second, third, and fourth class mail under the Union banner. In return, the franchisees were promised 30% of all revenues resulting from their deliveries, the offering of certain "training and indoctrination courses," and other benefits. The indictment charged Buchanan and his corporate enterprises with making the following knowingly false representations accompanying the solicitations:

(1) That investors and franchisees could earn great profits, and approximately a 500 percent profit on their investment within a year, and that franchisees would have net earnings of approximately $100.00 a week, within one month after purchase.

(2) That circulars and advertisements for deliveries would be available for delivery within 30 to 45 days.

(3) That similar delivery concerns had phenomenal success in "other" cities with franchises and deliveries.

(4) That this delivery firm was "unique" from similar concerns.

(5) That franchises would be repurchased with a 25 percent deduction at any time the franchisee desired, so that there was no way for the franchisee to lose money on his purchase of a franchise.

(6) That the defendants had invested $50,000.00 of their own money in the Union Postal Systems, Inc., and that the initial capital of the concern was $49,000.00.

(7) That the defendants had accepted orders from advertisers for deliveries totaling $40,000.00.

(8) That the defendant company was in good business condition and having good earnings. That the defendants orally and by means of lulling letters reassured those to be defrauded that their investment was secure and that the franchise and route future would be highly successful. The defendant firm furnished statements showing a stockholder equity of between $25,000.00 and $28,000.00.

(9) That the defendant firm had purchased and paid for three panel trucks to be used in the business.

(10) That the defendants had saved all franchise fees from investors and placed

---

1. "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be· delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both."

them in a separate bank account, so that there could be no loss to the franchisees.

(11) That purchasers of franchises or routes would be provided training and indoctrination courses, sales manuals, and training in merchandising procedures.

(12) That statements and bills of account, such as from doctors and retail store purchases, would be delivered.[2]

 Buchanan asserts three bases for reversal of the decision below. The first concerns the prosecutor's reading from a transcript of a tape during his final argument. This tape had not been introduced into evidence, but was instead an amplified version of the tape introduced as the government's Exhibit 12. Buchanan's attorney did not object to this action at trial, and we cannot hold that it resulted in plain error. Second, Buchanan claims that the evidence was insufficient to prove the existence of a scheme to defraud. We also find this contention to be without merit.[3]

Buchanan's third claim, that his use of the mails was not adequate to sustain a conviction under § 1341, merits a more extended discussion. Of the seven counts upon which Buchanan was convicted, the first three related to the sale of franchises through ads placed in three newspapers. The last four concerned the sale of Union stock to franchisees after they had already purchased their delivery routes. We consider first the use of the mails requirement under the newspaper counts.

 Buchanan depended primarily upon advertisements in three local newspapers for soliciting Union franchisees. Each of these papers depended to some extent upon the mails for its circulation:

| Newspaper | Total Paid Circulation (Avg. as of Oct. 1, 1974) | Mail Subscriptions |
|---|---|---|
| Harlingen Valley Morning Star | 20,412 | 691 |
| Brownsville Herald | 13,221 | 259 |
| McAllen Monitor | 18,803 | 245 [4] |

Buchanan asserts, however, that none of the government's witnesses who purchased franchises after reading the newspaper ads actually received their newspapers through the mails.[5] This fact, coupled with the fact that the number of mailed newspapers was relatively small, forms the basis of his claim that § 1341 cannot reach the activities charged in the first three counts.

The question here raised, in statutory terms, is whether Buchanan's use of the mails to deliver his ads through the newspapers was "for the purpose of executing [his] scheme or artifice or attempting so to do." We hold that it was. This case parallels *Atkinson v. U. S.,* 344 F.2d 97, 99 (C.A.8), *cert. denied,* 382 U.S. 867, 86 S.Ct. 141, 15 L.Ed.2d 106 (1965):

It is stipulated that the advertisements soliciting the victims were published in the Kansas City Star on the dates charged. In most instances, a reply to a box number at the Star was solicited. Responses by victims were followed up by

**2.** The government need not prove all the facts charged in the indictment. It need only prove enough of them to satisfy the essential elements of the crime. *U. S. v. England,* 480 F.2d 1266, 1269 (C.A.5), *cert. denied,* 414 U.S. 1041, 94 S.Ct. 543, 38 L.Ed.2d 332 (1973).

**3.** In holding the proof of the fraudulent scheme sufficient to support the jury verdict, we have not considered the "lulling letters" mailed to the franchisees after they had purchased. The evidence in this case was sufficient without resort to the letters.

*U. S. v. Ashdown,* 509 F.2d 793 (C.A.5), *cert. denied,* 423 U.S. 829, 96 S.Ct. 48, 46 L.Ed.2d 47 (1975), only held that lulling letters may be used to satisfy the use of the mails requirement.

**4.** Government Exhibits 3–5; cf. R. 25, 33, 39.

**5.** These witnesses were never asked whether or not the newspapers that they had read were home delivered or mailed. *See* R. 154, 169, 197, 212, 220–21, 230–31, 241, 268, 273, 314, 325, 341, 346, 378.

phone calls from Atkinson arranging appointments. At least 7,000 copies of each issue of the Star were distributed by mail. The use of the mail in furthering the scheme is established. This is not seriously questioned except for the contention that it does not apply here because all victims who testified received their newspaper by carrier. Such fact is not disputed. The contention is without merit. It is sufficient that the use of the mail was caused by defendants in furtherance of the fraudulent scheme. See *Pereira v. United States,* 347 U.S. 1, 8, 74 S.Ct. 358, 98 L.Ed. 435; *United States v. Sorce,* 4 Cir., 308 F.2d 299, 301; *Dranow v. United States,* 8 Cir., 307 F.2d 545, 557.

We agree with the holding in *Atkinson.*[6] Buchanan has misapprehended the requirements of the statute. He used the mails in order to disseminate his solicitation. He was thereby "attempting . . . to [execute]" his scheme. His use of the mails need not be an essential element of the scheme but only "incident to an essential part," *Pereira v. U. S.,* 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435, 444 (1954); *U. S. v. Crockett,* 534 F.2d 589, 593 (C.A.5, 1976). Hence, whether the use of the mails was effective in producing franchisees is irrelevant. The "gist of the offense" is "the insertion of the matter intended to effect the scheme to defraud in the mail." *U. S. v. Anderson,* 466 F.2d 1360, 1361 (C.A.8, 1972). Thus the statute requires not a "but for" relationship but only that the defendant use the mails in "furtherance" of the fraud, as *Atkinson* holds.

*U. S. v. Maze,* 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974), involving the use of stolen credit cards, does not dictate reversal here. *Maze* concerned the quite different problem of "whether [the] mailings were sufficiently closely related to respondent's scheme." *Id.* at 399, 94 S.Ct. at 648, 38 L.Ed.2d at 608. See also *U. S. v. Constant,* 501 F.2d 1284 (C.A.5, 1974), *cert. denied,* 420 U.S. 910, 95 S.Ct. 830, 42 L.Ed.2d 840 (1975).

Here, the problem is not the nexus between the mails and the fraud but rather the significance of a small number of mailings clearly made to attract franchisees.

■ As we have noted, Buchanan received concurrent sentences. Because we have upheld his conviction on the newspaper counts, we need not reach the validity of the convictions based upon mailings to franchisees after they had purchased delivery routes in order to sell them stock in the company. *U. S. v. Easterly,* 444 F.2d 1236, 1240 (C.A.5, 1971).

Buchanan's conviction is AFFIRMED.

JONES, Circuit Judge, dissenting:

The indictment charged the appellant with mail fraud. The scheme called for the sale by appellant's corporation of franchises.

On the question as to whether the newspapers carrying the advertisements of the franchises were "significant" the majority finds that this case parallels the Eighth Circuit case of *Atkinson v. U. S.,* 344 F.2d 97. In *Atkinson* there were over 7,000 of the newspapers mailed. Here there were 1195. In *Atkinson* the sales were primarily promoted by newspaper advertising, although it does not appear that those who were defrauded received their newspapers through the mail. Here the fraudulent sales were promoted primarily by personal solicitation. It does not appear that any of those who were defrauded ever saw the advertising in a newspaper that was in the mail. In this case 97.2 per cent of the newspapers were delivered by carrier and only 2.8 per cent were mailed. This is insignificant; it is de minimis. *Atkinson* stands alone and is not binding on this Court.

The "lulling letters", so called, were sent in an effort to sell stock to those who had theretofore purchased franchises. The scheme to sell franchises was at an end. Here, and it needs repetition, the fraudu-

---

**6.** This court has recently cited with approval the language quoted above. *U. S. v. Jackson,* 536 F.2d 628, 631 (C.A.5, 1976). The court in *Jackson* faced "a similar scheme involving

newspaper ads that solicited mail inquiries," although the precise issue was somewhat different from that in *Atkinson.*

lent scheme alleged was for the sale of franchises, not stock. For a valid conviction the mailing must be in furtherance of the scheme.

I think the convictions should be reversed with directions to enter a judgment of acquittal. There is ample evidence of fraud but mail fraud, in my opinion, is too short a peg on which to hang a conviction.