**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**J. Philippe LaFERRIERE and Frederic J.
White, Defendants-Appellants.**

No. 75–4468.

United States Court of Appeals,
Fifth Circuit.

Jan. 31, 1977.

---

**3.** *Bruce v. Estelle, supra.*

**4.** *Pate v. Robinson,* 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966); *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960).

GEWIN, Circuit Judge:

Appellants and five others were charged in a 25-count indictment with conspiracy, mail fraud, wire fraud, and interstate transportation of monies obtained by fraud. Both appellants pleaded not guilty and were tried in November, 1975. During the course of the proceedings the government dismissed numerous charges against each, and the jury returned verdicts of guilty against LaFerriere on one count of mail fraud and against White on seven counts of mail fraud. LaFerriere was sentenced to two years' imprisonment, and White received a two year suspended sentence and was placed on probation.

The facts in this case revolve around a complex scheme carried on from fall, 1970, to mid-April, 1971. Taking the view most favorable to the government,[1] the record shows that one Michael Strauss, who ran a company called General Financial, Inc., ("GF") in Tampa, Florida, promoted the basic scheme. GF was to act as agent for a sham corporation, Anglo-Canadian Group, Ltd. ("A–C"), which was held out to be in the mortgage commitment business. During the time period involved, A–C issued between thirty and forty worthless commitments. Advertisements were placed in newspapers stating that mortgage money was available through A–C. Prospective borrowers were directed to contact GF in Tampa. Strauss and others at GF would begin negotiations. The agreements provided that the borrower would pay eight points, that is, eight percent of the amount to be borrowed, to obtain the commitment. One point was to be paid immediately, to be held in escrow until the issuance of a satisfactory commitment upon which the borrower could obtain interim financing. The escrow agreement provided that the company issuing the commitment would have at least $75 million in assets.

Two companies, United Title Company and American Guaranty Title Company, were used as escrow agents. Appellant

Bruce A. Campbell, Tampa, Fla. (Court-appointed), for LaFerriere.

Henry Gonzalez, James R. Yon, Tampa, Fla., for White.

John L. Briggs, U. S. Atty., Jacksonville, Fla., E. Thomas Sullivan, Morris Silverstein, Washington, D. C., for plaintiff-appellee.

Before GEWIN, GEE and FAY, Circuit Judges.

1. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680, 704 (1942); *United States v. Leslie*, 542 F.2d 285, 288 (5th Cir. 1976); *United States v. Box*, 530 F.2d 1258, 1263 (5th Cir. 1976).

White was listed as an officer of each title company. He received the funds to be held in escrow, and notwithstanding the agreement to defer disbursal, disbursed or caused to be disbursed monies to Strauss and other defendants soon after the funds were received.

Appellant LaFerriere was executive vice-president of A–C. The evidence tended to show that his role was to "put off" borrowers who were upset about the use of escrowed funds before issuance of a satisfactory commitment. To assist LaFerriere in allaying the borrowers' fears, two accounts in Philadelphia banks were opened by one Friedman of the stock brokerage firm of Royden and Company. Worthless debentures of A–C were deposited in these accounts, and upset borrowers were referred to the banks for confirmation of LaFerriere's assurances that assets for a satisfactory commitment were being set aside.

Both appellants testified. LaFerriere's defense was that he was innocent of any knowing wrongdoing and that he was merely a figurehead at A–C with no real operative role. The gist of his testimony was that Strauss was the moving force behind the scheme and all the activities associated with it. White also disclaimed any significant participation in the scheme and said he was unaware that the disbursals of funds from escrow were premature. He thought either that the borrowers had instructed him to disburse funds upon concluding that the commitments were satisfactory or that the commitments were in fact satisfactory.

Appellant White alleges three grounds for reversal of his conviction. He contends that the district court erred in admitting certain extrajudicial statements on the basis of the co-conspirator exception to the hearsay rule, in denying his motions for mistrial and severance, and in denying his motion for judgment of acquittal notwithstanding the verdict.

■ We find appellant White's contentions without merit and affirm. There was sufficient evidence of conspiracy or joint enterprise for the court to allow the jury to consider extrajudicial statements of appellant's confederates. Fed.R.Evid. 104(a), 801(d)(2)(E); *United States v. Lawson*, 523 F.2d 804, 806 (5th Cir. 1975); *United States v. Oliva*, 497 F.2d 130, 132–33 (5th Cir. 1974). Appellant has not made the showing of compelling prejudice necessary to render the court's denials of motions to sever and for mistrial an abuse of discretion. *See United States v. Perez*, 489 F.2d 51, 65 (5th Cir. 1973), *cert. denied*, 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974). Finally, the evidence that White did not operate the title companies separate and apart from A–C and GF, plus his disbursal of escrow monies in violation of the agreements, was sufficient for the jury reasonably to infer fraudulent intent and participation in the fraud.

Appellant LaFerriere raises a serious question concerning the scope of the mail fraud statute. During the proceedings below the government dismissed nine of the counts against him before the case was submitted to the jury. Of the remaining counts, the jury acquitted him on nine and convicted him on one—Count One. His motions for judgment of acquittal and for judgment notwithstanding the verdict were denied. He contends that even assuming arguendo that he was a knowing participant in a scheme to defraud, the letter on which Count One was based was not mailed or received "for the purpose of executing such scheme or artifice" as required by 18 U.S.C. § 1341.[2] We agree.

2. The mail fraud statute provides as follows: Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent

Count One, the count on which appellant LaFerriere stands convicted, charged him and others with devising a scheme to defraud and using the mails in furtherance of that scheme. The mailing which is the basis of that count is a letter sent by Harold Hammett, an attorney in Fort Worth, Texas, to the attention of Fred White at the Tampa address of American Guaranty Title Company.[3] Mr. Hammett wrote the letter on behalf of his client, Mr. Ed Baker, who as President of Baker Development Company, Inc., had deposited monies with American Guaranty, of which Mr. White was president, as escrow agent as an advance fee to obtain long term mortgage funding from A–C. Baker and his company were clearly victims of the fraud, as the promised mortgage commitment was never finalized and the $9,000 deposit was never returned.

■ The mail fraud statute in essence requires proof of a mailing caused by a defendant and proof that the mailing was for the purpose of executing the scheme. Appellant concedes that he can be held responsible for causing the letter from Mr. Hammett to be sent under *Pereira v. United States*, 347 U.S. 1, 8–9, 74 S.Ct. 358, 363, 98 L.Ed. 435, 444 (1954), where the Court held that one causes the mails to be used

> or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both. 18 U.S.C. § 1341.

3. The body of the letter is as follows:

American Guaranty Title Company
1211 Northwest Shore Boulevard,
Suite 411
Tampa, Florida 33607

Attention: Mr. Fredric [sic] J. White,
            President
            Re: Baker Development
                Company, Inc.
                Fort Worth, Texas

Gentlemen:

Our client, Baker Development Company, Inc., has referred to us the matter of the $9,000.00 deposited with you as escrow agent on or about November 9, 1970.

when he "does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended. . . ." However, we must also consider the Supreme Court's recent observation that "Congress could have drafted the mail fraud statute so as to require only that the mails be in fact used as a result of the fraudulent scheme. [footnote omitted]. But it did not do this, instead, it required that the use of the mails be 'for the purpose of executing such scheme or artifice. . .'" *United States v. Maze*, 414 U.S. 395, 404, 94 S.Ct. 645, 651, 38 L.Ed.2d 603, 611 (1974).[4]

The government contends that lulling victims into a false sense of security was an essential part of the instant scheme and that since the Hammett letter was incidental to this essential aspect, the mailing was "in execution" of the scheme. In making this argument the government seizes upon isolated language in several cases, principally *Pereira v. United States, supra*; *United States v. Shepherd*, 511 F.2d 119 (5th Cir. 1975); and *United States v. Ashdown*, 509 F.2d 793 (5th Cir.), *cert. denied*, 423 U.S. 829, 96 S.Ct. 48, 46 L.Ed.2d 47 (1975).

> It is our client's understanding under the terms of the conversation and agreement between you and E. L. Baker, Jr., that funding of the commitment is necessary for the $9,000 escrow fee to be earned. Baker Development Company deposited with you the $9,000 in your capacity as a fiduciary.
>
> Accordingly, this letter is to demand that you deliver to me a verified letter stating that you still hold the $9,000 in escrow as the fiduciary of Baker Development Company, Inc., pending funding of the commitment.
>
> If you do not comply with this request within five days from receipt of this letter, our office intends to press both civil and criminal action against your company for breach of fiduciary duty, beginning with an immediate complaint to the Florida Insurance Commission.
>
> Very truly yours,
> SIMON & SIMON
> Harold D. Hammett

4. The Supreme Court in *Maze* obviously disagreed with certain of our credit card mail fraud cases. *See id.* at 398 n. 2, 94 S.Ct. 645, 38 L.Ed.2d at 607 n. 2.

But the language in those opinions must be read in light of the facts presented in them. In *Pereira* one of the defendants had obtained a check from the victim in California and had endorsed it over to a bank in Texas for collection. After the check cleared the collection process, Pereira obtained a cashier's check from the Texas bank with himself named as payee, cashed it, and absconded with the funds. The Court held that the mailing in the collection process was in execution of the scheme because it was "incident to an essential part of the scheme." 347 U.S. at 8, 74 S.Ct. 358, 363, 98 L.Ed. at 444. There an essential part of the scheme was receipt of the funds. Use of the mails was incident to that part of the scheme in the sense that use of the mails was a foreseeable and *necessary* step in completion of the scheme. The Court's language does not mean, as the government seems to argue, that a mailing somehow related to an aspect of the scheme brings the scheme within the scope of the mail fraud statute.

Neither are the decisions of this court in *United States v. Shepherd, supra,* and *United States v. Ashdown, supra,* helpful to the government. *Shepherd* involved a check-kiting scheme in which Shepherd received forced credit from a bank through a series of deposits of worthless checks to cover the dishonor of previously deposited worthless checks. The success of that scheme was "uniquely" dependent upon the delays in the check collection process attributable to use of the mails. 511 F.2d at 121–22. Certainly the instant scheme was in no way dependent upon the mailing or receipt of Hammett's threatening letter.

*Ashdown* is also inapposite to the instant case. There the defendants were convicted of securities fraud and mail fraud in connection with a scheme to defraud in the offer and sale of common stock in a corporation. Six of the mail fraud counts were based on mailings of stock certificates, confirmations of stock purchases, or annual reports after the initial stock purchases.

The court recognized that the facts as to those counts presented a classic case of "lulling"—the post-purchase mailings were "designed to lull the victim into a false sense of security, postpone inquiries or complaints, or make the transaction less suspect." 509 F.2d at 799–800. *Ashdown* and other "lulling" cases [5] are obviously distinguishable from the instant case, where the mailing did not have any tendency to postpone inquiries or discovery of the fraud, but rather alerted the perpetrators to the fact that a victim strongly suspected that he was a victim of a fraud and proposed to take remedial action.

Not only is the government's argument unsupported by the authority on which it relies, it is contrary to the recent Supreme Court opinion in *United States v. Maze, supra.* Maze stole a credit card and used it to obtain food and lodging as he travelled from Louisville, Kentucky, to Southern California. The only mailings occurred when the motel owners mailed receipt invoices to the card issuer.

The Court concluded that these mailings were not covered by the statute because they did not occur in furtherance of the scheme or in aid of an effort to lull victims. The government in *Maze* sought to rely, as it does to some extent here, on *United States v. Sampson,* 371 U.S. 75, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962). The Court, speaking through Mr. Justice Rehnquist, rejected that argument:

> We do not believe that Sampson sustains the Government's position. The subsequent mailings there were designed to lull victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place. But the successful completion of the mailings from the motel owners here to the Louisville bank increased the probability that respondent would be detected and apprehended. 414 U.S. at 403, 94 S.Ct. 645, 650, 38 L.Ed.2d at 610.

5.   *E. g., United States v. MacClain,* 501 F.2d 1006, 1012 (10th Cir. 1974); *United States v. Strauss,* 452 F.2d 375, 380 (7th Cir. 1971), *cert.* denied, 405 U.S. 989, 92 S.Ct. 1252, 31 L.Ed.2d 455 (1972); *United States v. Porter,* 441 F.2d 1204, 1211–12 (8th Cir. 1971).

The Court in *Maze* framed the issue in this type of case as "whether [the] mailings [are] sufficiently closely related to [appellant's] scheme to bring his conduct within the statute." *Id.* at 399, 94 S.Ct. 645, 648, 38 L.Ed.2d at 608. It is clear from the Court's opinion that the close relation of the mailings to the scheme does not turn on time or space, but on the dependence in some way of the completion of the scheme or the prevention of its detection on the mailings in question.[6] For example, the Court stated that:

> [T]he mailings here were directed to the end of adjusting accounts between the motel proprietor, the Louisville bank, and [the owner of the card], all of whom had to a greater or lesser degree been the victims of respondent's scheme. Respondent's scheme reached fruition when he checked out of the motel, and there is no indication that the success of his scheme *depended in any way* on which of his victims ultimately bore the loss. [footnote omitted]. Indeed, from his point of view, he probably would have preferred to have the invoices misplaced by the various motel personnel and never mailed at all. 414 U.S. at 402, 94 S.Ct. 645, 649, 38 L.Ed.2d at 609 (emphasis added).

Application of the *Maze* rationale in this case dictates that the judgment of conviction of appellant LaFerriere must be reversed. The only likely effect of the Hammett letter would be to further detection of the fraud or to deter its continuation. Therefore the mailing on which Count One is based was not "in execution of the scheme or artifice to defraud." Since appellant was convicted on that one count only, his judgment of conviction is reversed.

In conclusion, we find no error in the conviction of appellant White. However, as to appellant LaFerriere, the conduct described in the only count on which he stands convicted cannot constitute mail fraud under 18 U.S.C. § 1341.

6. Comment, *Survey of the Law of Mail Fraud*, 1975 U.Ill.L.F. 237, 252. Adoption of the "dependence" test here does not conflict with this court's rejection of such a test in *United States v. Buchanan*, 544 F.2d 1322, 1325 (5th Cir. 1977). In the instant case we apply the dependence test to determine whether there is a sufficient nexus between the mailings and the scheme. In *Buchanan* that nexus was clear: "Buchanan depended primarily upon advertisements in three local newpapers for soliciting franchisees," *id.* at 1324, and the mailing

AFFIRMED IN PART; REVERSED IN PART.

of some newspaper subscriptions was reasonably foreseeable and incidental to use of that medium. *Id.* at 1325. The court in *Buchanan* simply went on to hold that once such nexus is established the government need not prove that success of the scheme actually depended on the mailings in a "but for" sense. *Id.* Our holding is entirely consistent with *Buchanan.*