**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Troy L. CASTILE, Defendant-Appellant.**

**No. 84–5878.**

United States Court of Appeals, Sixth Circuit.

Argued June 7, 1985.

Decided July 18, 1986.

Joseph J. Levitt, Jr. (argued), Knoxville, Tenn., for defendant-appellant.

John W. Gill, U.S. Atty., Knoxville, Tenn., Jimmie Baxter (argued), for plaintiff-appellee.

Before MERRITT and WELLFORD, Circuit Judges; and CELEBREZZE, Senior Circuit Judge.

WELLFORD, Circuit Judge.

Defendant Troy L. Castile appeals from his conviction on four counts of mail fraud under 18 U.S.C. § 1341 in connection with a scheme to defraud an insurance company by deliberately burning a restaurant for the purpose of collecting the proceeds of a fire insurance policy. The defendant contends on appeal that insufficient evidence was offered to convict him of mail fraud and that he was denied a fair trial due to

---

limitations on voir dire, the district court's refusal to allow an opening statement, and the alleged hostility of the district court.

## I. FACTS

Defendant Troy L. Castile was indicted and charged with engaging in two separate mail fraud schemes in violation of 18 U.S.C. § 1341. Counts one through four of the indictment charged that Castile, aided and abetted by persons unknown, deliberately had his house burned for the purpose of collecting the proceeds of a fire insurance policy. Counts five through eight charged that Castile, along with codefendants James Brown, Alfred Hurst, and Mack Shelton, engaged in a scheme to defraud an insurance company by deliberately burning a restaurant built on the site of the previously destroyed house for the purpose of collecting the proceeds of a fire insurance policy.

After the jury failed to reach a verdict on the first four counts, these counts were dismissed on the government's motion. The jury also reached no verdict as to defendants Shelton and Hurst. Defendant Brown pled guilty before trial and testified for the government, and defendant Shelton pled guilty subsequent to the trial. Castile was convicted on counts five through eight and sentenced to seven years imprisonment followed by five years probation.

The first scheme charged in the indictment, for which Castile was not convicted, concerned an alleged plan to burn his home for the insurance proceeds. Castile had allegedly attempted to convert his 19,000 square foot Knoxville, Tennessee, home into a tourist attraction in conjunction with the 1982 World's Fair there. In late 1981, the indictment further alleged, Castile's financial problems led him to plan the burning of his home. Castile's home was destroyed by fire on January 2, 1982. Castile filed proofs of loss with his insurance company [1] amounting to over $900,000. Although the insurance company first reject-

ed the proofs of loss based on its belief that the fire resulted from arson, the company ultimately compromised the claim by paying Castile $824,500 after an extensive investigation which failed to uncover proof of Castile's involvement.

The second scheme charged in the indictment, for which Castile was convicted, involved a plan to burn a restaurant in order to collect the proceeds of the fire insurance policy. Using a part of the proceeds from his earlier insurance claim, Castile built the International Showplace Restaurant on the same site where his home had been located. The restaurant opened on June 11, 1982, in the hope it might capitalize on the traffic generated by the Knoxville World's Fair, and, on the same day, the New Hampshire Insurance Company insured the building and its contents for $380,000.

Following a dismal grand opening, due in part to a failure to obtain a liquor license, the restaurant was thereafter closed in order to bring it up to city building code requirements and to obtain an occupancy permit. The restaurant reopened a few weeks later, but, according to the testimony of codefendant Brown, business was "[t]errible. And it got worse." Brown testified that the restaurant "never made any money.... It was a loser from the word 'Go.'" In August, First Tennessee Bank, which had financed the restaurant, refused to make any more loans to Castile to keep the restaurant open. After seeking unsuccessfully to find other financing and to sell the business, Castile allegedly decided to have the building burned for the insurance proceeds. We now recite what may be taken as the proof considered in its most reasonable favorable light for the government. *See Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).

Castile offered codefendant Hurst $15,-000 to burn down the restaurant. Castile and Brown, however, arranged to be in Florida at the time to provide themselves

---

1. Two separate insurance companies carried the policies for Castile's home and the later-con- structed restaurant.

an alibi. On August 26, 1982, with Castile and Brown out of town, Hurst attempted unsuccessfully to destroy the restaurant, causing only minimal damage. Castile quickly contacted codefendant Shelton and offered him $5,000 to burn the restaurant and, again, arranged an alibi for himself. In the early morning of September 1, 1982, the International Showplace Restaurant was destroyed by fire.

Shortly after the fire, the insurer, the New Hampshire Insurance Company, began an investigation of the fire to determine the cause of the fire and whether the person named on the policy was involved. The Company employed attorney Joseph B. Yancey to supervise the investigation, and Yancey in turn hired Ralph Newell, a private investigator. On September 16, 1982, Yancey mailed a letter to Newell, describing the desired information to be obtained.[2] This letter formed the basis for count five of the indictment.

The insurance company adjustor was informed that another adjustor had begun preparation of a claim to be filed in connection with the September 1, 1982, fire. On October 5, 1982, Castile's attorney notified the insurance company that they would be willing to negotiate settlement of the insurance claim if this could be accomplished by November 16, 1982. On October 12, 1982, the adjustors for the insurance company mailed a letter to Yancey, the insurance company's attorney, calling to Yancey's attention a report filed by one of their adjustors.[3] This letter formed the basis for count six of the indictment.

On October 19, 1982, the adjustors for the insurance company again mailed a letter to Yancey, discussing discrepancies in Castile's statements concerning his ownership interest in Miami Development Corporation, the entity that owned and operated the International Showplace Restaurant.[4]

2.  The letter read in full:
    September 16, 1982
    Mr. Ralph Newell
    Newell Investigative Services, Inc.
    P.O. Box 5127 WSB
    Gainesville, Georgia 30501
    Re: Miami Development Corporation
        Fire of September 1, 1982
        My File No.: 2794–I
    Dear Ralph:
    We have now found a way to "secure" the files and the information contained in them concerning this case, and I would appreciate your rendering me a detailed report of your activities and the information you have gained in your investigation. This should include copies of any documents secured by you in the investigation and accounts of what various people have told you, if a statement was not secured from them.
    There is a host of information coming into the file from various sources, and I need to keep all parts of it straight. This is why I am requesting your reporting to me.
    Please do anything and everything legal and proper to determine the cause of the fire and keep me advised.
    Cordially yours,
    Joseph B. Yancey
    JBY:jc
    cc: Mr. Lenard Robinson
        Ms. Nancy Nellissen

3.  The letter read in full:
    October 12, 1982
    Mr. Joseph B. Yancey, Esquire
    Yancey, Webb, Jackson, Anderson & Harb

Blount Park Building
918 State Street, S.W.
Knoxville, Tennessee 37902
RE: Insured: Miami Development Corporation
    Claim Number: 42 2184 POP 8467458
Dear Joe:
Regan Morgan has recently come by my office and deposited with me his second report with regards to his handling of the lose [sic] on the structure of International Show Place Restaurant. Regan's report indicates that he sent you a carbon copy of only the typed portion of the report. In reviewing everything that I have found in this file, I feel that at this time the only thing you may wish to review is Regan's report titled "Summary of Personal Property." Of some interest may be those items listed as actual cash value, items moved prior to the fire. This is listed at $6,561.88.
If you wish to review any of the other items in the file, please do not hesitate to contact my office and I will send them to you.
Very truly yours,
Lenard F. Robinson, Branch Manager
American International Adjustment Co., Inc.
LFR/lt
Enclosure

4.  The letter read in full:
    October 19, 1982
    Joe Yancey, Esquire
    Yancey, Webb, Jackson, Anderson & Harb
    Blount Park Bldg.

The insurance on the restaurant had been taken out in the name of the Miami Development Corporation. According to Castile, all of his interest in the corporation had been sold to his elderly retired uncle, and Castile merely worked for the corporation. (The evidence indicated, however, that Castile owned and controlled the corporation and merely used it to obscure his involvement.) The letter also notes that two insurance policies, a standard fire insurance policy and a builder's risk policy, might have been in effect at the time of loss. This letter formed the basis for count seven of the indictment.

918 State St., S.W.
Knoxville, Tenn. 37902
RE: Miami Development Corp
    042–2134–POP–846–58–53
    Your File #: 2794–I
Dear Joe:
As per our telephone conversation, please find attached a copy of a statement taken from Troy Castile on 01–06–82. In this statement Castile tells GAB that he owns 50% of Miami Development Corporation. I note in Newell's report that Castile now says he has no interest or ownership in Miami Development Corporation. I find this strange since New Hampshire insured the policy with a rider showing Castile as an additional named insured. We will need more information about his ownership.
As I also indicated, we have been informed by Regan Morgan or GAB that Miami Development Corporation is going to try and make a claim under the builders risk policy which they had issued in March of 1982. Attached you will find a complete copy of this policy. The policy provides coverage for $130,000.00. Some specific information about this policy is very interesting. On the date that the fire occurred the New Hampshire Underwriting office went through all of their policies opened on Miami Development. They found this builders risk policy. Since they had already issued a permanent coverage (POP 846458) they sent out a standard cancellation notice. This went out on September 2, 1982, effective September 16, 1982.
A copy of the cancellation was sent to the Pace Agency. On September 8, 1982, New Hampshire received an accord form 35(11–77) Cancellation Request Policy Release from the Pace Agency saying that the builder Risk policy should be cancelled on June 11, 1982, because the policy was rewritten. Pace Agency also wants to take credit for $2,708.00 in returned premium. This form is also signed by Troy Castile in the Policy Release block.

On October 27, 1982, two proofs of loss were filed with the insurance company as a result of the September 1, 1982, fire. Through the proofs of loss, which were hand-delivered to the insurance company's Atlanta office, Castile claimed $390,000 under the permanent insurance policy and $114,557 under the temporary builder's risk policy.

On December 21, 1982, Bruce A. Anderson, Yancey's partner and also an attorney for the insurance company, sent by certified mail a letter to the defendant denying the claims.[5] The company denied liability

Based upon the Cancellation Notice signed by Castile, do you feel this policy was cancelled on 06–11–82? Please review and advice [sic] as soon as possible.
Very truly yours,
Lenard F. Robinson, Branch Manager
American International Adjustment Co.
LFR/ss

5.  The letter read in full:
CERTIFIED MAIL
Mr. Charles H. Leinart
2300 Chipman
Knoxville, Tennessee
Mr. Troy Castile
1647 Hillwood Drive
Knoxville, Tennessee
Re: Insured: Miami Development Corporation
    Company: New Hampshire Insurance Group
    Policy No.: POP–846–58–53 and POP–846–74–58
    Date of Loss: September 1, 1982

Gentlemen:
Joe Yancey and I are attorneys for New Hampshire Insurance Company in this case, and we have been furnished the Sworn Statement and Proof of Loss dated October 25, 1982 in each of the above referenced policies. The first policy (policy #POP–846–58–53) is rejected because that policy was replaced by the second policy (policy #POP–846–74–58) on or about June 11, 1982, and it was consequently void at the time of the September 1 fire.
The Proofs of Loss on both policies are rejected because the named insured Miami Development Corporation had its charter revoked by the Secretary of State of Tennessee on October 18, 1979 for non-payment of taxes, and, consequently this corporation had no power to contract at the time these policies were purchased.
Both Proofs of Loss on the above policies are further rejected because the cause of the Sep-

based upon the replacement of the builder's risk policy by the later policy; the prior revocation of the insured corporation's charter by the Tennessee Secretary of State for nonpayment of taxes; and arson allegedly procured by Castile, a named insured on the policy. This letter formed the basis for count eight of the indictment.

## II. VOIR DIRE AND OPENING STATEMENT

The defendant argues that he was denied a fair trial by the district court due to limitations imposed on voir dire, the district court's refusal to allow an opening statement, and the alleged hostility of the district court which resulted in interruptions of cross-examination and supplying of answers to witnesses.

Defendant asserts that the district court improperly limited defense counsel's questioning during the jury selection process. The record clearly indicates that the district court did limit questioning by defense counsel during voir dire, but in view of our decision in Part III, we find it unnecessary to decide this issue. Defendant also argues that the district court erred in refusing to allow defense counsel to make an opening statement. We find it unnecessary also to address this and the other issues raised by defendant dealing with the district court's conduct of the trial.

## III. MAIL FRAUD

We have delayed in our resolution of the principle issue, whether the mailings in

question came within the reasonable purview of 18 U.S.C. § 1341, in order to study the recent Supreme Court decision, *United States v. Lane*, — U.S. —, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986). We conclude that the Court has in *Lane* essentially reiterated its prior position in *United States v. Maze*, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974). In *Lane*, the use of the mails in connection with an arson scheme involved foreseeable mailings of the defendants' false statements and false proof of loss claims, each calculated to further and to advance the fraudulent scheme and to trigger an insurance payment based upon the defendants' false misrepresentations. The false statements, moreover, were accompanied in *Lane* by defendants' fabricated repair invoices. The jury was properly instructed in *Lane* that the charged mailings "must have been made 'for the purpose of executing the scheme to defraud' ... and further that mailings, 'which *facilitate concealment of the scheme*' are covered by the statute." 106 S.Ct. at 734 (emphasis added). We do not find that *Lane* is helpful to the prosecution for mail fraud under the circumstances here present.

The defendant challenges the sufficiency of the evidence to sustain his conviction on four counts of mail fraud. The mail fraud statute prohibits the use of the mails "for the purpose of executing" a scheme to defraud.[6] 18 U.S.C. § 1341. A conviction for

tember 1, 1982 fire has been determined to be arson, and to the best information and belief of New Hampshire Insurance Company, this arson was caused, designed and/or procured by the named insured defendants in violation of the terms of the insurance policies and Proofs of Loss.

The New Hampshire Insurance Company further reserves the right to amend or add to this rejection of this or any other Proofs of Loss if further investigation so warrants. No rights are waived.

Sincerely,
Bruce A. Anderson
BAA:jc
cc: Edward Michael Ellis, Esquire
Enc. Proofs of Loss

**6.** The mail fraud statute provides:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according

mail fraud requires proof of (1) a scheme to defraud (2) which involves a use of the mails (3) for the purpose of executing the scheme.

The defendant does not seriously contest the first two elements. A scheme to defraud was clearly alleged and proven. Four uses of the mails which were legally attributable to Castile were alleged and proven. In *Pereira v. United States*, 347 U.S. 1, 8–9, 74 S.Ct. 358, 362–63, 98 L.Ed. 435 (1954), the Supreme Court held that one "causes" the mails to be used where he "does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended." *See also United States v. Reynolds*, 762 F.2d 489, 494 (6th Cir.1985); *United States v. Lane*, 735 F.2d 799, 806–08 (5th Cir.1984), *rev'd on other grounds*, —— U.S.. ——, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986). The uses of the mails alleged in counts five through eight were clearly foreseeable by the defendant. The basic issue on appeal is thus whether the uses of the mails in this case were "for the purpose of executing" the defendant's arson scheme.

■ A determination of whether uses of the mail were "for the purpose of executing" the fraud involves an inquiry into whether the "mailings were sufficiently closely related to [the] scheme." *United States v. Maze*, 414 U.S. 395, 399, 94 S.Ct. 645, 648, 38 L.Ed.2d 603 (1974). In order for a mailing to be in furtherance of a scheme, the scheme's completion or the prevention of its detection must have depended in some way on the charged mailing. *See United States v. LaFerriere*, 546 F.2d 182 (5th Cir.1977); *United States v. Tarnopol*, 561 F.2d 466, 471–73 (3d Cir. 1977); *United States v. Otto*, 742 F.2d 104, 108–09 (3d Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 978, 83 L.Ed.2d 980 (1985); *United States v. Blecker*, 657 F.2d 629,

636–37 (4th Cir.1981), *cert. denied*, 454 U.S. 1150, 102 S.Ct. 1016, 71 L.Ed.2d 304 (1982); *United States v. Mitchell*, 744 F.2d 701, 703–04 (9th Cir.1984).

This test of dependence does not demand that the use of the mails rather than of a private messenger or other means was itself essential to the fraudulent scheme or that "the success of the scheme actually depended on the mailings in a 'but for' sense." *United States v. LaFerriere*, 546 F.2d [182] at 188 n. 6. [ (1977) ] *Accord, United States v. Buchanan*, 544 F.2d 1322, 1325 (5th Cir.1977). It instead requires that the thing mailed was an integral part of execution of the scheme so that the use of the mails was in this way "incident to an essential part of the scheme." *Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954). *Accord United States v. Buchanan*, 544 F.2d at 1325.

*United States v. Kent*, 608 F.2d 542, 546 (5th Cir.1979), *cert. denied*, 446 U.S. 936, 100 S.Ct. 2153, 64 L.Ed.2d 788 (1980). Similarly, where the purpose of a mailing conflicts with, rather than promotes, the scheme to defraud, the mailing will not support a conviction under the mail fraud statute. *See United States v. Maze*, 468 F.2d 529, 534–35 (6th Cir.1972), *aff'd*, 414 U.S. 395, 402–03, 94 S.Ct. 645, 649–50, 38 L.Ed.2d 603 (1974); *United States v. Staszcuk*, 502 F.2d 875, 880–81 (7th Cir. 1974), *modified on other grounds*, 517 F.2d 53 (7th Cir.) (en banc), *cert. denied*, 423 U.S. 837, 96 S.Ct. 65, 46 L.Ed.2d 56 (1975); *United States v. Wormick*, 709 F.2d 454, 462–63 (7th Cir.1983).

■ In support of its position that the four mailings at issue were "for the purpose of executing" defendant's arson scheme, the government argues that, in devising his scheme to obtain payment under the insurance policies, Castile anticipated that he would be under suspicion and that the insurance company, believing the

to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than

$1,000 or imprisoned not more than five years, or both.

18 U.S.C. § 1341.

fire had been caused by arson, would conduct an investigation of the fire prior to making a decision on whether or not to pay. Based on the experience and knowledge Castile gained from his successful claim based on the earlier January 1982 fire, the government argues, "Castile not only anticipated the investigation but made plans (such as his alibi) to defeat it." Since the insurance company's investigation "was a necessary step toward receipt of the fruits of the scheme ... [e]ach mailing charged in the indictment was a mailing arising out of the insurance investigation and thus was 'incident to an essential part of the scheme.'"

The foreseeability of a use of the mails is not directly relevant to whether that use was "for the purpose of executing" the fraud. It is, no doubt, quite relevant to whether Castile "cause[d]" the mailings in question. As stated above, the uses of the mails in this case were reasonably foreseeable. The issue before us, however, is whether the scheme's completion or the prevention of its detection depended in some way on the mailings which formed the basis of the indictment. The investigation by the insurance company itself could have furthered Castile's scheme only had it been unsuccessful in finding evidence of Castile's involvement. To the extent that the insurance investigation tended to produce evidence of Castile's involvement, it conflicted with Castile's purpose and would not have furthered his scheme.

In *United States v. Maze*, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974), the defendant stole a credit card and used it to obtain food and lodging as he traveled from Louisville, Kentucky to southern California; the only mailings occurred when the motel owners mailed receipt invoices to the card issuer. The Supreme Court found that although the defendant might have caused the mailings, an insufficient connection existed between the mailings and the fraudulent scheme to support the conviction. The Court noted that the defendant's scheme had "reached fruition" prior to the mailings and there was

no indication that the success of the scheme depended in any way on which of his victims ultimately bore the loss. Indeed, from his point of view, he probably would have preferred to have the invoices misplaced by the various motel personnel and never mailed at all.

*Id.* at 402, 94 S.Ct. at 649 (footnote omitted). The Court noted that the mailings in fact "increased the probability that respondent would be detected and apprehended." *Id.* at 403, 94 S.Ct. at 650. The Court further found that the mailings were not designed to lull the victims into a false sense of security and thus further the scheme. *Id.* at 403, 94 S.Ct. at 650; *see also United States v. Sampson*, 371 U.S. 75 (1962). Similarly, it has been held that neither a letter by an attorney for the victim of a fraud to a defendant threatening legal action and demanding a commitment to return of funds paid to the defendant, *see United States v. LaFerriere*, 546 F.2d 182, 185–87 (5th Cir.1977), nor a letter unilaterally demanding that defendant honor a check returned for insufficient funds, *see United States v. Otto*, 742 F.2d 104, 109 (3d Cir.1984), supports a conviction for mail fraud.

The letter that supports count five of the indictment, *see supra* note 2, was a request by the insurance company's attorney, who was supervising the company's investigation of the fire, to a private investigator hired by the attorney for "a detailed report of your activities and the information you have gained in your investigation." The attorney requested that the investigator "do anything and everything legal and proper to determine the cause of the fire." At this juncture, the investigation was being instituted and no evidence had yet been uncovered that could either assist, or hinder, the ultimate purpose of the arson scheme. We find that this mailing was not sufficiently closely related to the scheme to bring Castile's conduct within the statute. It certainly did not facilitate concealment of the fraudulent scheme.

The letter that supports count six of the indictment, *see supra* note 3, was also gen-

erally in furtherance of the investigation conducted by the insurance company's attorney, not in furtherance of defendant's scheme. The letter calls the attorney's attention to particular points in a lengthy adjustor's valuation report on the destroyed building undertaken on behalf of the company. The letter notes that the report indicates that approximately $6,500 worth of personal property was moved from the premises prior to the fire, and thus would not support a claim. This letter is clearly a part of the overall investigation of the fire's cause,[7] and the purposes of the letter clearly conflict with Castile's scheme. Here again, the letter does not facilitate concealment of the scheme, nor does it lull the victim into a false sense of security. It does not, in our opinion, fall within the framework of the statutory requirement that it somehow be "for the purpose of executing" the arson scheme. *See United States v. Lane*, 106 S.Ct. at 733. The "apprehension" of the defendants was not, by this mailing, made "less likely than if no mailings had taken place." *Id.* at 733 (quoting *Maze*, 414 U.S. at 403, 94 S.Ct. at 650).

The letter that supports count seven of the indictment, *see supra* note 4, was another letter from the insurance company's adjustor concerning whether Castile had an ownership interest in Miami Development Corporation and whether the builder's risk policy was in force at the time of loss. The letter notes (and was apparently accompanied by a copy of) a statement by Castile to an adjustor on January 6, 1982, that he owned fifty percent of the corporation. (This statement was made within days after Castile's home was destroyed by fire and months before the restaurant fire.) The letter then notes Castile's statement after the restaurant fire, contained in the private investigator's report, that he no longer had such an interest, and observes that this is "strange since New Hampshire insured the policy with a rider showing Castile as an additional named insured."

With regard to the builder's risk policy, the letter notes that Castile personally endorsed and returned to the company after the restaurant fire a form acknowledging the policy to have been cancelled prior to the fire.

In our view, this mailing may present a closer question, largely because it discusses a statement clearly made by Castile for the purpose of furthering his scheme (i.e., his more recent statement disclaiming any interest in the corporation). More important, however, is the fact that this letter merely calls attention to this previously reported statement in order to contrast it to a prior inconsistent statement enclosed by the writer and Castile's status as an additional named insured. Thus, this portion of the letter would clearly tend to further the company's investigation and increase the probability that Castile's scheme would be detected. The purposes of the remaining portion of the letter similarly were in conflict with Castile's scheme to defraud. Thus, we find that the mailing supporting count seven was not an integral part of the execution of the scheme and thus Castile's conviction on count seven cannot stand.

The letter that supports count eight of the indictment, *see supra* note 5, was the insurance company's rejection of Castile's proofs of loss and denial of liability under the policies. The government argues that this letter, like the others, was merely "routine correspondence" and would have led to the success of Castile's scheme had this second scheme followed the pattern of his first arson scheme. In our view, this letter was clearly for the *sole* purpose of defeating Castile's scheme and thus the scheme's completion did not depend on this mailing.

Here, the letters by the insurance company's attorney or adjustor referred to in counts seven and eight posed a clear threat to Castile's scheme, particularly since the evidence indicated well-grounded suspicions concerning Castile's involvement in a prob-

---

7. The writer of this letter, for example, received a copy of the first letter by the insurance company's attorney to the private investigator, *see* *supra* note 2, and the writer's later letter indicates his close involvement in the effort to detect the fraud, *see supra* note 4.

able fraudulent scheme. Castile's scheme was not dependent upon or closely related to these mailings; rather, their purpose was the investigation and the detection of the scheme. We thus find that Castile's conviction based on these uses of the mails by others cannot stand.

The facts of this case, where the purpose of the mailings was to defeat a fraudulent scheme, preclude the application of the mail fraud statute. *See United States v. Maze,* 414 U.S. at 402–03, 94 S.Ct. at 649–50; *United States v. Lane,* 106 S.Ct. at 733–34; *United States v. LaFerriere,* 546 F.2d at 185–87; or *United States v. Otto,* 742 F.2d at 109. Had the government relied on Castile's mailing a false and fraudulent claim or proof of loss which was knowingly fraudulent, our conclusion would have been different because such a mailing would, indeed, have been in furtherance of the scheme.

The decision of the district court is accordingly reversed, and the convictions are set aside. We add that it appears clear in this case that the state should have initiated prosecution of Castile under the arson statutes. The evidence adduced here would be a substantial basis for such action.