

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-18-2006

# USA v. Hevener

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-2794

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"USA v. Hevener" (2006). *2006 Decisions.* Paper 83.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/83

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 05-2794
_____

UNITED STATES OF AMERICA

v.

JOHN HEVENER, JR.,

Appellant

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 04-cr-00298)
District Judge:  Honorable Eduardo C. Robreno
_____

Submitted Under Third Circuit LAR 34.1(a)
December 13, 2006

Before:  FISHER, CHAGARES and GREENBERG, *Circuit Judges*.

(Filed: December 18, 2006)
_____

OPINION OF THE COURT
_____

FISHER, *Circuit Judge*.

John Hevener, Jr. was charged in a two-count indictment for mail fraud in

violation of 18 U.S.C. § 1341.  Following a jury trial, he was convicted on both counts,

sentenced to 33 months in prison and ordered to pay $634,394.50 in restitution. He now

appeals his conviction. For the reasons below, we will affirm his conviction.

## I.

Because we write only for the parties, we will forgo a lengthy recitation of the

legal and factual background to this case. Hevener, in addition to being involved in

several overseas business ventures, was the creator of a Ponzi[1] scheme in which he

solicited investments from his accounting clients, claiming they were high-yield, low-risk

investments, and then disbursed a majority of the investment money to himself or

corporations he controlled.

Beginning in 1990, Hevener encouraged his clients to invest money in various

business entities of which Hevener claimed to be a part. In 1990, based on Hevener's

representations that such investments were virtually "risk free," Edward Ream made two

investments, one for $14,000 and one for $24,000, in United Equity & Leasing

Corporation ("United Equity"), a company that was controlled entirely by Hevener. The

$24,000 loan was repaid with interest in 1992.

---

[1] A "Ponzi scheme" is "[a] fraudulent investment scheme in which money contributed by later investors generates artificially high dividends for the original investors, whose example attracts even larger investments." Black's Law Dictionary 1180 (7th ed.1999). The result of most Ponzi schemes is collapse, leaving numerous investors with significant losses. *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc.*, 267 F.3d 340, 343-44 (3d Cir. 2001).

In 1992, Hevener convinced Gregory Stauffer and his wife to invest $110,000 by purchasing shares of United Equity stock. As with Ream, Hevener represented that the investment was very safe. Hevener also encouraged other clients, including the Haldemans and the Sheetzes, to invest more than $350,000 in United Equity, a corporation called "Fujibanc" – which Hevener claimed was a working bank – and various other entities. Fujibanc was not, in fact, a banking entity at all, but a company that Hevener was using to process payments from United Equity to a venture in Latvia. While Hevener sent some of the money his clients invested to the actual investment, he distributed much of it to other companies owned by him and his son.

In 1994, Ream began asking questions about the $14,000 loan he had made to Hevener in 1990. In response, Hevener moved money he had received from the Haldemans into a United Equity account and repaid Ream's loan with between $6,000 and $7,000 of interest. Based on what he believed was a successful return on his investment, Ream loaned Hevener an additional $40,000 in 1995 and 1996. During the entirety of this period, Hevener sent his investors the requisite tax forms for interest earnings and paid these so-called "interest earnings" out of the investors' original capital.

In 1999, after receiving what he believed to be an inaccurate statement of his interest earnings, Ream asked Hevener to return the $40,000 loan. After delaying for several months, Hevener sent a letter to Ream informing him that United Equity had suffered unexpected losses "to the point where a Chapter 7 bankruptcy is now being

3

considered." The letter further stated that United Equity had been serving as a holding company for overseas projects that "have completely collapsed without any possibility of recovery," and that Ream's "loan to United Equity & Leasing Corporation is now classified as non-performing."

The Stauffers had similarly begun inquiring after their investment when Gregory Stauffer lost his job. By 1999, Hevener informed them that their entire investment had been lost. After Stauffer sent Hevener a letter requesting that he repay the investment or risk litigation, Hevener sent Stauffer a letter postmarked from Washington, D.C. claiming that Stauffer would be hearing from Hevener's Washington, D.C. attorney. No attorney ever contacted the Stauffers.

The letter to Ream regarding the non-performance of his loan and the letter to the Stauffers regarding Hevener's attorney formed the basis of Hevener's indictment.

## II.

The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction over Hevener's appeal by virtue of 28 U.S.C. § 1291.

Hevener styled his claim as challenging the sufficiency of the indictment, which we review *de novo*. *United States v. Al-Ame*, 434 F.3d 614, 616 (3d Cir. 2006) (citing *United States v. Hedaithy*, 392 F.3d 580, 590 n.10 (3d Cir. 2004)). However, a review of his brief suggests that what he is really claiming is that the government presented insufficient evidence that the two mailings were "in furtherance" of a scheme to defraud.

4

We review challenges to sufficiency of the evidence under a particularly deferential standard, viewing evidence in the light most favorable to the government and overturning a conviction only where no reasonable trier of fact could find the elements of the crime beyond a reasonable doubt. *United States v. Dent*, 149 F.3d 180, 187 (3d Cir. 1998). However, because the two underlying mailings were legally sufficient to form the basis of an indictment and because there was ample evidence on which a jury could base a guilty verdict, it is not necessary to determine which theory Hevener is asserting. *Al-Ame*, 434 F.3d at 616.

III.

On appeal, Hevener claims that the letters he sent to Ream and Stauffer could not be seen as letters in "furtherance of" a scheme to defraud. In order to prove mail fraud under 18 U.S.C. § 1341, the government must prove that the defendant had a scheme to defraud and that the mailings charged in the indictment were made "for the purpose of executing such scheme." 18 U.S.C. § 1341; *Parr v. United States*, 363 U.S. 370, 385 (1960). The mail fraud statute does not reach every mailing that is the byproduct of a scheme to defraud. Rather, a mailing must be "sufficiently closely related" to a defendant's scheme. *United States v. Cross*, 128 F.3d 145, 150 (3d Cir. 1997). A mailing is sufficiently related to a scheme to defraud where it "further[s] the scheme to defraud or [is] incident to an essential part of that scheme." *United States v. Ruuska*, 883 F.2d 262, 264 (3d Cir. 1989). While mailings made after the object of a scheme has been

5

accomplished may not be "sufficiently closely related to the scheme to support a mail fraud conviction," *id.*, "mailings 'designed to lull [fraud] victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place' have been found to constitute actionable mail fraud." *Tabas v. Tabas*, 47 F.3d 1280, 1295 n.18 (3d Cir. 1995) (quoting *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1416 n.3 (3d Cir. 1991)).

For example, in *Ruuska*, we found that two letters were sent in order to lull victims after the completion of a fraudulent investment scheme. The defendant in *Ruuska* sent two identical letters to the victims of his investment scheme which stated that there were possible problems with the financial aspects of the investments, that lawsuits had been filed causing a delay and that the defendant would keep the victims apprised. 883 F.2d at 264. On appeal, the defendant claimed that these letters were insufficient to further his scheme because he was not seeking to create a false sense of security and, even if he was, the victims could no longer be "lulled" because they were aware of the nature of the scheme. *Id.* at 264-65. We disagreed, finding that the letters were sufficient to "support an inference by the jury that they 'were mailed by the defendants to the victims for the purpose of lulling them by assurances that the promised services would be performed.'" *Id.* at 265 (quoting *United States v. Sampson*, 371 U.S. 75, 81 (1962)).

6

While the two mailings charged against Hevener were arguably sent after Hevener had successfully defrauded his accounting clients into investing, they qualify as mailings undertaken with the purpose of lulling the victims and preventing apprehension by the authorities. As the government stated in its brief, the charged letters created a cloak of legitimacy for Hevener's criminal actions, thereby preventing earlier detection and apprehension by the authorities. The letter Hevener sent to Ream suggested that his money was lost unexpectedly through a bad investment, instead of stating what actually happened to Ream's money – it was the casualty of a collapsed Ponzi scheme. While Hevener's contention that he did not give Ream a false sense of security by claiming that his money was safe is correct,[2] the mailing need not give that kind of security. Hevener's mailing aimed to blind Ream to the true nature of the scheme that caused his loss, thereby holding an official investigation at bay. *United States v. Lebovitz*, 669 F.2d 894, 896 (3d Cir. 1982) (quoting *United States v. Maze*, 414 U.S. 395, 403 (1974)) (where mailings postpone a victim's complaint to the authorities, those mailings are made "for the purpose of executing" the scheme to defraud).

---

[2]Even if the letter to Ream was literally true – which the evidence viewed in the light most favorable to the government suggests it is not – the letter's purpose was to further Hevener's fraudulent scheme. Therefore, it may still form the basis for the indictment. *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1413-14 (3d Cir. 1991) (citing *Schmuck v. United States*, 489 U.S. 705, 715 (1989)) ("The mailing need not contain any misrepresentations. Rather 'innocent mailings – ones that contain no false information – may supply the mailing element.'").

Similarly, the letter Hevener sent to the Stauffers was intended to prevent them from discovering the true nature of the Ponzi scheme and to stall them in their efforts to pursue litigation against Hevener. The letter falsely informed the Stauffers that Hevener's attorney would be contacting them and provided a new address at which they could contact him. The inclusion of a new address and reference to his attorney suggested that the loss was legitimate and that Hevener was interested in discussing the legal implications of the lost investment. Hevener responded to the Stauffers' legal concerns and delayed the filing of a lawsuit while the Stauffers waited to hear from his attorney. In short, Hevener forestalled the filing of a complaint. *Lebovitz*, 669 F.2d at 896.

The facts of this case are easily distinguishable from those in *United States v. Otto*, 742 F.2d 104 (3d Cir. 1984). In *Otto*, one count of the defendant's mail fraud conviction was overturned. The charged mailing was a letter from a victim of the defendant's fraudulent scheme threatening to sue the defendant. Because the letter was not "directly or impliedly" invited by the defendant, the letter could not be in furtherance of the defendant's scheme. *Id.* at 109. "Its purpose was not to continue a relationship between the parties or arrange for a compromise." *Id.* Rather, "its 'only likely effect would be to further detection of the fraud or deter its continuation.'" *Id.* (quoting *United States v. LaFerriere*, 546 F.2d 182, 187 (5th Cir. 1977)). We concluded that the demand letter from the victim was very different than a letter from the defendant arranging a settlement,

8

as the latter would further the fraudulent scheme by avoiding a confrontation with the victim. *Id.* Hevener's letter to the Stauffers is comparable to the settlement offer as it sought to further his relationship with the Stauffers through legal discussions between their attorneys and was aimed at preventing the filing of a legal claim. Because the letter aimed to prevent the detection of his fraudulent scheme, it is a sufficient basis for a mail fraud indictment and conviction.

In short, both letters authored by Hevener furthered his fraudulent scheme by suggesting to Hevener's investors that their money had been legitimately lost. Such an indication has the effect of forestalling legal action by those victims and preventing official investigation into the underlying fraudulent scheme.

For the reasons set forth above, we will affirm the District Court's denial of the Rule 29 motion and Hevener's conviction.