14 F.3d 603
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 UNITED STATES of America, Plaintiff-Appellee
v.
William E. POHL, Defendant-Appellant.
 No. 93-3142.
 United States Court of Appeals, Sixth Circuit.
 Dec. 8, 1993.
 
 Before: KENNEDY, MILBURN, and GUY, Circuit Judges.
 PER CURIAM.
 
 
 1
 Following a jury trial, defendant was convicted on 11 counts of mail fraud and aiding and abetting. 18 U.S.C. Sec. 1341 and 18 U.S.C. Sec. 2. On appeal, defendant raises eight issues, none of which we find meritorious. Accordingly, we affirm.
 
 I.
 
 2
 During the 1980s, William E. Pohl was involved in a variety of business ventures. By the middle of the decade, Pohl had established a small network of business entities. These included: Wepex, Inc., founded in January 1982 to provide accounting and income tax services; Dynacorp, founded in December 1982 to sell residential security systems and provide landscaping and ground maintenance; and Investas, founded in January 1984 with the ostensible purpose of investing other people's money. Additionally, Pohl had partnership interests in Educentre, a day-care center, and WERG Asset Fund, whose stated purpose was to engage in investment activities.
 
 
 3
 To support his ventures, Pohl relied extensively on funds provided by investors. The manner in which he handled these funds would ultimately lead to his conviction on charges of mail fraud and aiding and abetting. The pertinent facts that served as the basis of his conviction are as follows.
 
 
 4
 From 1984 through 1986, Pohl received approximately $325,000 from 12 individual clients. These clients had hoped that Pohl would make sound investment decisions with their money, thereby providing them with a favorable rate of return. Pohl represented to some of his clients that he would place their investments in an account with the brokerage firm of Kidder Peabody & Co. With his clients' authorization, Pohl was to invest the funds from this account in such things as stock or interests in money market funds. Pohl represented to other clients that their monies would be placed into Investas, and, once there, would be invested for their benefit.
 
 
 5
 Subsequently, Pohl withdrew the funds from the Kidder Peabody account and deposited them into the Investas checking account. Pohl then began to draw from the Investas account in a series of transactions. By mid-1986, the account had been completely depleted. As the government established, Pohl, through these transactions, managed to convert his clients' funds for his own benefit. Evidence introduced at trial revealed that, in addition to spending the money on personal things, Pohl used some of the money to pay off other individuals who had previously invested money with him in unrelated ventures.
 
 
 6
 It did not take long before Pohl's clients became suspicious. As the government puts it: "In late 1985, some of the investors were starting to ask tough questions about what was happening to their money." (Appellee's Brief at 5.) In an apparent effort to mollify his clients, Pohl explained that he had invested their money in Investas zero coupon bonds. The salient feature of this type of bond is that the bondholder receives neither interest nor any part of the principal until the date of maturity. This was potentially a convenient means of keeping disgruntled clients at bay; Pohl could respond to their inquiries by simply claiming that no monies would be forthcoming until their bonds matured--in this case, December 1990.
 
 
 7
 Pohl claims that he established Investas as a "financial product that would be able to assist other firms in which he had an interest, but at the same time would benefit the investors." (Appellant's Brief at 10.) Zero coupon bonds were to be the principal source of investment funds for Investas. Among the companies Pohl helped recapitalize through Investas were Dynacorp, Educentre, and WERG Asset Fund. Only one investor knew that Pohl owned and controlled Investas. Pohl did not at any point tell his clients that he was putting their money into his companies.
 
 
 8
 Having made the claim that he had invested his clients' money in zero coupon bonds, Pohl now had to substantiate it. He did so in two ways. First, for some clients he prepared an IRS Form 1099, which reflected the interest supposedly earned on the bonds. He then mailed these forms to the appropriate clients, who were thereby given the impression that Pohl had legitimately invested their funds.[1]
 
 
 9
 Second, Pohl enlisted the unwitting support of a financial institution, Citizens Federal Savings and Loan. Sometime in April 1986, Pohl entered Citizens' branch in Cincinnati, where he met with David Kilgo, a trust officer. Pohl established individual retirement accounts at Citizens in the name of most of his clients. He then deposited their bonds into these accounts, while retaining Citizens to serve as the custodian. Pohl provided Kilgo with the names of the bondholders and the supposed value of the matured bonds. In valuing the bonds, Kilgo had to rely on the information supplied by Pohl due to the fact that Investas was a closely-held company whose stock was not publicly traded.
 
 
 10
 Pursuant to its internal procedures, Citizens then mailed quarterly statements to Pohl's clients showing that it held the bonds in question.[2] Kilgo had informed Pohl during their meeting that these mailings would take place. Those who received these statements, which Citizens continued to issue on a regular basis into 1990, were also reassured of the safety and legitimacy of their investments. Pohl contends that by retaining Citizens as custodian he was not attempting to lull his clients into a false sense of security, and that the bank's mailing of quarterly statements were not occasioned by any scheme to defraud on his part.
 
 
 11
 On April 15, 1992, a federal grand jury returned an indictment charging Pohl with 12 counts of mail fraud, 18 U.S.C. Sec. 1341,[3] and aiding and abetting, 18 U.S.C. Sec. 2. Specifically, the indictment alleged that Pohl had used the United States mail in order to execute an investment scheme based on "false and fraudulent pretenses, representations, and promises." (App. at 7.) As a result of Pohl's scheme, the indictment alleged, Pohl's clients collectively had lost nearly all of the monies--approximately $325,000--they had invested. The counts listed the various individuals and entities that had invested with Pohl, and each count was based on the mailing of either a Form 1099 or a quarterly statement.
 
 
 12
 Pohl entered a not guilty plea, and his trial commenced on August 19, 1992. At trial, Pohl's clients testified as to how much they had invested and why they had done so. To show what Pohl did with their investments, the government introduced a summary of the activities in the Investas checking account for the period between its inception, March 12, 1984, and mid-1986. This summary revealed that virtually all of the deposits into the account came from funds invested by Pohl's clients.
 
 
 13
 The government introduced an additional exhibit which detailed how Pohl dispensed with his clients' investments: (1) $71,112 to Pohl directly; (2) $76,837 to repay former investors; (3) $10,020 to repay Pohl's brother-in-law;[4] (4) $6,227 to Pohl's father; (5) $9,100 to Pohl's aunt; (6) $31,535 to Wepex; and (7) $9,824 to make payments on Pohl's mother's car.
 
 
 14
 On August 28, 1992, the jury found Pohl guilty on all but one count of the 12 counts listed in the indictment.[5] Subsequently, Pohl was sentenced to 30-months' custody on each count, the sentences to run concurrently. In addition, Pohl was placed under three years of supervised release following completion of his incarceration. Finally, Pohl was ordered to pay restitution in the amount of $234,268.60 and an assessment of $550. This appeal followed.
 
 II.
 
 15
 Pohl raises eight issues on appeal. These issues will be addressed in turn.
 
 A.
 
 16
 First, Pohl argues that the district court erred in refusing to instruct the jury as to the operative statute of limitations. Rejecting Pohl's recommended instruction, the district court instructed the jury that to convict they had to conclude that Citizens' mailings were in furtherance of Pohl's scheme to defraud.[6] In addition, the court instructed that the use of the mail to execute a scheme to defraud "may include the use of the mails as a means of concealment designed to lull the victim into a false sense of security, postpone their ultimate complaint to the authorities and therefore make the apprehension of the defendant less likely than if no mailings had taken place." (App. at 128-29.)
 
 
 17
 For non-capital offenses, 18 U.S.C. Sec. 3282 provides:
 
 
 18
 Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed.
 
 
 19
 The statute had run in his case, Pohl argues, because whatever scheme he may have pursued concluded at the time he is alleged to have converted his clients' funds, sometime in mid-1986. Pohl disputes that his scheme encompassed the mailings made by Citizens, which continued into 1990. Accordingly, Pohl maintains that the court erred by "refus[ing] to allow the jurors to consider the question of the statute of limitations with regard to whether the so-called lulling was part of the overall scheme to defraud, or whether in fact, it was [Pohl's] activities which caused the lulling." (Defendant's Brief at 22.)
 
 
 20
 Pohl's argument is misguided because it fails to comprehend the fact that the instruction issued by the district court, in effect, subsumed the statute of limitations issue. An essential element of mail fraud, as the court instructed, is a finding that the mailings in question were in furtherance of the scheme to defraud. (App. at 125.) Absent this element, a defendant facing a mail fraud charge would be entitled to acquittal.
 
 
 21
 Thus, because the jury concluded that the mailings were in furtherance of the scheme to defraud, the five-year statute of limitations was not implicated. Had the jury come to the opposite conclusion, i.e., that the mailings were only incidental to and not in furtherance of the fraudulent scheme, Pohl would have been acquitted, irrespective of the statute of limitations. Under these circumstances, the district court's instruction was not only appropriate, but also it avoided the possibility of confusing the jury.
 
 B.
 
 22
 Next, Pohl raises directly the issue of whether the mailings in question were in furtherance of a scheme to defraud. These mailings consisted of his Form 1099s and Citizens' quarterly statements.
 
 
 23
 "A conviction for mail fraud requires proof of (1) a scheme to defraud (2) which involves a use of the mails (3) for the purpose of executing the scheme." United States v. Castile, 795 F.2d 1273, 1277-78 (6th Cir.1986); see also United States v. Goodpaster, 769 F.2d 374 (6th Cir.), cert. denied, 474 U.S. 983 (1985). Mailings that are intended either to conceal the fraud and/or lull investors into inaction are considered to be in furtherance of the scheme. United States v. Lane, 474 U.S. 438, 451-53 (1986).
 
 
 24
 Moreover, it is not essential that one perform the mailing oneself, as long as one "causes" the mails to be used. The Supreme Court has held that one "causes" the mails to be used where he "does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended...." Pereira v. United States, 347 U.S. 1, 8-9 (1954) (citation omitted); see also Castile, 795 F.2d at 1278.
 
 
 25
 Pohl does not dispute that the use of the mail in the instant case was foreseeable; he does, however, argue that the mailings involved here did not promote a scheme to defraud. In Castile, we set forth the following analysis:
 
 
 26
 A determination of whether uses of the mail were "for the purpose of executing the fraud" involves an inquiry into whether the "mailings were sufficiently closely related to [the] scheme." In order for a mailing to be in furtherance of a scheme, the scheme's completion or the prevention of its detection must have depended in some way on the charged mailing.
 
 
 27
 This test of dependence does not demand that the use of the mails rather than of a private messenger or other means was itself essential to the fraudulent scheme or that "the success of the scheme actually depended on the mailings in a 'but-for' sense." It instead requires that the thing mailed was an integral part of execution of the scheme so that the use of the mails was in this way "incident to an essential part of the scheme."
 
 
 28
 795 F.2d at 1278 (citations omitted).
 
 
 29
 Here, Pohl's direct mailings, the 1099s, as well as those he caused to be mailed, the quarterly statements, clearly met the dependence test outlined in Castile. Pohl retained Citizens and provided it with the names of his clients and the value of the matured bonds with the knowledge that Citizens would, in turn, mail to clients these quarterly statements. Pohl's objective, it appears, was to, at least momentarily, appease a clientele that was growing increasingly suspicious. Indeed, he seems to have been largely successful in achieving his objective. His mailings were thus "an integral part of the execution of the scheme."
 
 
 30
 Pohl maintains that "mailings which are routine and required by law which are themselves intrinsically innocent even though they take place during the course of carrying out ... the fraudulent scheme may not be sufficiently closely related in order to support a conviction under the mail fraud statute." (Defendant's Brief at 24.) See Castile, 795 F.2d 1273; United States v. Tarnopol, 561 F.2d 466 (3d Cir.1977); United States v. LaFerriere, 546 F.2d 182 (5th Cir.1977). The cases Pohl relies upon, however, are ones in which the mailings at issue were merely incident to an aspect of the scheme, not foreseeable and necessary steps to the completion of the scheme. See, e.g., Castile, 795 F.2d 1273 (holding that mail fraud conviction could not stand because mailings by insurance company sent as part of its investigation into possible arson served to defeat, rather than further, defendant's scheme); LaFerriere, 546 F.2d 182 (holding that a letter by an attorney for the victim of a fraud to a defendant threatening legal action and demanding a commitment to return of funds paid to defendant does not support a mail fraud conviction). In Pohl's case, the mailings he sent and caused to be sent were--far from being too remote--crucial to the maintenance of his scheme.
 
 
 31
 Pohl also claims that his mailings of the 1099s do not fall within the purview of the mail fraud statute because he was required by law to make them. Although the law would require a Form 1099 to be sent on a legitimate zero coupon bond that earned interest, such was not the case here.
 
 C.
 
 32
 Pohl also contends that the district court committed prejudicial error in instructing the jury on the offense of aiding and abetting. Because Citizens had no knowledge of the scheme to defraud, Pohl argues, there was, by definition, no crime that he could aid or abet. See United States v. Patrick, 965 F.2d 1390 (6th Cir.) (holding that since financial institution did not commit a crime, the customer who structured the complained-of transaction could not be held criminally liable for aiding and abetting), cert. denied, 113 S.Ct. 376 (1992).
 
 
 33
 Aiding and abetting has two elements: (1) an act by the defendant that contributes to the commission of the crime; and (2) an intention to aid in the commission of the crime. United States v. Frazier, 880 F.2d 878 (6th Cir.1989), cert. denied, 493 U.S. 1083 (1990). Pohl was charged with aiding and abetting in all counts of his indictment, and, the government claims, there was some evidence indicating that others had assisted him during various stages of his scheme to defraud.[7]
 
 
 34
 Although there was some evidence that others were involved in the fraudulent scheme, the primary focus of the prosecution all along was clearly Pohl. Pohl may be held responsible for the mailings made by Citizens, but this necessarily would not make him an aider and abettor since mailing or causing to be mailed is an element of the mail fraud offense.
 
 
 35
 While technically Pohl may be correct that an aiding and abetting instruction was not appropriate in the instant case, any error in giving the instruction was harmless as a matter of law. The court's aiding and abetting instruction constituted mere surplusage that in no way prejudiced Pohl. Also, the sentence was unaffected by the aiding and abetting convictions.
 
 D.
 
 36
 Pohl also urges this court to find error in the district court's jury instruction regarding the defense of good faith. The district court rejected a proposed instruction submitted by Pohl. The proposed instruction read:
 
 
 37
 A person does not commit a deliberate fraud if his words and actions are done in good faith. A person speaks or acts in good faith if he honestly believes that what he says is true; he honestly believes that his business idea is practical and has a reasonable chance of success even though you might believe with the benefit of hindsight that the plan was impracticable and unlikely to succeed; and he honestly intended to carry out his promises.
 
 
 38
 (App. at 19-20.) See Hawley v. United States, 133 F.2d 966 (10th Cir.1943) (approving instruction offered by Pohl). Instead, the court opted for the following instruction:
 
 
 39
 Good faith on the part of a defendant is a defense to the charge of mail fraud.
 
 
 40
 But that term, good faith, as used as a possible defense in mail fraud prosecution is defined as a genuine belief at the time each alleged false statement or representation was communicated, that each such statement or representation was true.
 
 
 41
 Good faith does not include the defendant's belief or faith that the venture will eventually meet his or her expectations. That belief is not in and of itself a defense to a charge of mail fraud.
 
 
 42
 (App. at 126.)
 
 
 43
 This instruction was not devised out of whole cloth. Rather, it is essentially the same instruction this court considered in United States v. Stull, 743 F.2d 439, 445-46 (6th Cir.1984), cert. denied, 470 U.S. 1062 (1985).[8] As we noted in Stull, "[s]ince Hawley was decided, courts have consistently held that a defendant's honest belief in the ultimate success of a venture is not in itself a defense to a charge of mail fraud." Id. at 446 (citations omitted).
 
 
 44
 In Stull, we approved of the district court's instruction, and we do so again here.
 
 E.
 
 45
 Pohl asserts that the district court improperly admitted evidence of other business activities in which he had engaged. Pohl claims that such evidence should have been excluded pursuant to Rule 404(b) of the Federal Rules of Evidence, which reads:
 
 
 46
 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident....
 
 
 47
 The evidence in question involved the testimony of (1) Carol DuBois, the daughter of an elderly couple, the Kempers, who had invested money with Pohl in a venture unrelated to the instant case; and (2) Herman Wenker, an attorney hired by DuBois and the Kempers to assist the couple in recouping their investment. Together their testimony established that, after repeated threats of legal action, Wenker finally was able to recover the Kempers' money. This money, the evidence revealed, came from funds supplied by the individual clients listed in Pohl's indictment.
 
 
 48
 Pohl objected to the introduction into evidence of Wepex certificates evidencing the Kempers' investment with him. The court erred in admitting the evidence over his admission because, as Pohl maintains, "[t]he only purpose of the DuBois testimony in this trial was to try and show that [Pohl] was a thief and had the propensity to engage in criminal acts." (Appellant's Brief at 33.)
 
 
 49
 "Rule 404(b) only bars evidence of 'prior bad acts' ... that are offered to show criminal disposition or propensity. If the evidence has an independent purpose, its admission is not prohibited by Rule 404(b)." United States v. Ushery, 968 F.2d 575, 580 (6th Cir.) (citation omitted), cert. denied, 113 S.Ct. 392 (1992). Moreover, evidence of uncharged bad acts is not considered "other crimes" evidence under Rule 404(b) "if it 'arose out of the same transaction or series of transactions as the charged offense, if it [is] inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime [on] trial.' " United States v. Roberts, 933 F.2d 517, 520 (7th Cir.1991) (quoting United States v. Weeks, 716 F.2d 830, 832 (11th Cir.1983)).
 
 
 50
 Here, it is not altogether clear that Rule 404(b) applies, for the evidence Pohl complains of does not appear to be "bad act" evidence. Paying off a pre-existing, legitimate debt, in and of itself, surely cannot be called a crime, wrong, or bad act within the meaning of the rule. If Pohl's satisfaction of his debt to the Kempers is "bad" at all, it is only vicariously or tangentially so, i.e., only to the degree it can be woven into the fraudulent scheme that is the subject of this litigation.
 
 
 51
 Even assuming that Rule 404(b) is implicated, however, the government's purpose in offering evidence related to Pohl's dealings with the Kempers was not to establish propensity but, rather, to show what Pohl did with his client's funds. Simply put, the government's theory of the case was that, after he had fraudulently converted his clients' funds, Pohl attempted to cover-up his actions--through the use of various mailings--by lulling his clients into the false belief that their monies had been legitimately invested. From the government's standpoint, then, the testimony of both DuBois and Wenker spoke to the fraudulent scheme it was attempting to prove, not to isolated and independent "other acts." Accordingly, Pohl's Rule 404(b) argument is rejected.
 
 F.
 
 52
 Pohl further claims that the court's refusal to admit into evidence a tape recording, which captured a phone conversation between himself and a Citizens trust officer, constituted reversible error. The officer, Kilgo, had testified as a witness for the government, and Pohl hoped that he could use the recording to impeach Kilgo during cross-examination. Pohl sought to distance himself from Citizens' mailings by proving, through the recording, that Citizens alone was responsible for sending out the quarterly statements.
 
 
 53
 The recording is alleged to have been made sometime during the spring of 1988. According to Pohl, the recording was significant because it contained, among other things, Kilgo's admission that Citizens had been sending out "erroneous" statements to Pohl's clients and because it showed that Kilgo was aware of the pendency of a civil suit brought by one of Pohl's clients, Elaine Bolan-Belmont.[9] This tended to refute the statements made by Kilgo during direct examination.
 
 
 54
 After listening to the recording, the district court denied Pohl's request that it be admitted into evidence. The court reasoned: "[A]ll this is is a self-serving declaration by [Pohl]. I would say at least 90% of this is his statement which he will have an opportunity to make if he cho[o]ses to from the witness stand. I don't see one word in there that is impeaching of this witness. I have heard only a monologue, and I'm not willing that that monologue be put into evidence." (App. at 417-18.) The court did permit, however, Pohl to play the portion of the tape "which impeaches [Kilgo's] statement that he didn't know of the litigation until a certain date." (Id. at 423.)
 
 
 55
 Pohl's claim that the recording should have been admitted as impeaching evidence finds no support in the record. For instance, Kilgo never testified that he was unaware of the litigation between Bolan-Belmont and Pohl. (Plaintiff's Brief at 25.) The recording could not have impeached Kilgo in this instance because there was nothing to impeach.
 
 
 56
 In addition, this court fails to see the relevance of Pohl's assertion that the quarterly statements Citizens mailed to Pohl's clients were erroneous. These statements, Pohl alleges, caused his clients to believe that their bonds were immediately worth their matured value. This argument appears to rest on a misconception of the nature of the fraud involved in the instant case. The fraudulent aspect of Pohl's case is not that his clients were led to believe that their bonds were worth something immediately but that, ultimately, they would be worth something at all. Pohl was able to get Citizens to lend its name to his fraudulent scheme and thereby induce his clients into believing that their money was in safe, capable hands. The fact that they received somewhat misleading statements from Citizens has no bearing on Pohl's culpability.
 
 
 57
 In any event, Kilgo did acknowledge issuing these erroneous statements on cross-examination. Indeed, he acknowledged all of the points Pohl had hoped to make through the admission of the recording. Accordingly, if the district court made any error in refusing to admit the recorded conversation between Kilgo and Pohl, such error was harmless. United States v. Mechanik, 475 U.S. 66, 72 (1986).
 
 G.
 
 58
 In his penultimate argument, Pohl claims that the district court erred in denying his motion for acquittal made pursuant to Rule 29 of the Federal Rules of Criminal Procedure. Pohl claims that there was insufficient evidence to support a finding that he was either engaged in a scheme to defraud and/or that the mailings he sent or caused to be sent were, in fact, intended to further that scheme.
 
 
 59
 When faced with a motion for acquittal, a district court must view all of the evidence in a light most favorable to the government. The motion must be granted when the evidence is insufficient to sustain a conviction. United States v. Adamo, 742 F.2d 927 (6th Cir.1984), cert. denied, 469 U.S. 1193 (1985). This court will reverse a conviction if the "judgment is not supported by substantial and competent evidence upon the record as a whole." United States v. Stone, 748 F.2d 361, 363 (6th Cir.1984), cert. denied, 498 U.S. 822 (1990). We follow the same test when considering denials of motions for acquittal brought under Federal Rules of Criminal Procedure 29. United States v. Holloway, 731 F.2d 378, 381 (6th Cir.), cert. denied, 469 U.S. 1021 (1984).
 
 
 60
 A review of the record here reveals that there was, indeed, sufficient evidence to support Pohl's conviction, and therefore we will not disturb the district court's decision to deny his motion for acquittal.
 
 H.
 
 61
 Finally, Pohl contends that the evidence against him was insufficient to sustain a conviction as to count four. Specifically, Pohl argues that the victim in count four, Bolan-Belmont, did not receive her 1987 Form 1099 in the mail; because there was no mailing relative to this count, he argues, his corresponding conviction cannot stand.
 
 
 62
 In support, Pohl cites the testimony of Karen Schulte, at one time an attorney for Pohl. Schulte testified that she personally gave a copy of a Form 1099 to Bolan-Belmont on February 15, 1988. Schulte's testimony conflicted with that of Bolan-Belmont given earlier in Pohl's trial. Bolan-Belmont testified that she was sure that she had received the form in the mail.
 
 
 63
 Pohl urges this court to resolve this conflict in favor of Schulte.[10] We decline to do so. Faced with the same choice, the jury obviously decided that a mailing had taken place. Viewed in the light most favorable to the government, we cannot say that their decision was sufficiently inconsistent with the evidence presented to warrant reversal.
 
 
 64
 For the foregoing reasons, we AFFIRM.
 
 
 
 [1]
 Pohl claims that one of his investors, the victim detailed in count four, received her Form 1099 by hand delivery. (Defendant's Brief at 17.)
 
 
 [2]
 The first series of these statements were manually prepared and listed the value of the bonds as "not priced." Thereafter, the statements indicated the market value of the bonds as equal to their matured value. As Pohl noted, however: "It was not appropriate that a market price be placed on the zero coupon bond quarterly statements, because these were not publicly traded marketable securities." (Defendant's Brief at 19.) The issuance of these statements, Pohl further asserts, was a matter controlled entirely by the bank. (Id. at 19-20). These "erroneous" statements evidently gave Pohl's clients the mistaken impression that their bonds were immediately worth their stated mature value. Pohl blames these statements for "these ultimate problems." (Id. at 20.)
 
 
 [3]
 This section provides in relevant part:
 Whoever, having devised or intending to devise any scheme or artifice to defraud ... for the purpose of executing such scheme or artifice or attempting so to do ... knowingly causes to be delivered by mail according to the direction thereon ... any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.
 18 U.S.C. Sec. 1341.
 
 
 [4]
 In 1978, this brother-in-law, James Richter, had given Pohl $20,000 to invest. Between 1980 and 1984, Pohl claimed that these funds were tied up in investments. Eventually, Pohl began making interest payments and returning small amounts of the principal on Richter's investment. These payments came out of the Investas checking account
 
 
 [5]
 The court had granted the government's motion to dismiss count five
 
 
 [6]
 The court stated:
 The use of the United States mail in furtherance of the scheme to defraud is an essential element of the offense charged. Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business or where such use can reasonably be foreseen, even though not actually intended, then he causes the mails to be used.
 (App. at 125.)
 
 
 [7]
 Possible accomplices included Citizens and Todd Jackson, hired by Pohl to sell Investas bonds and to act as Investas' president
 
 
 [8]
 The Stull instruction stated:
 You are instructed that good faith on the part of a defendant is a defense to a charge of mail fraud.
 "Good faith," as used as a possible defense in a mail fraud prosecution, is defined as a genuine belief at the time each alleged false statement or representation was communicated, that each such statement or representation was true.
 "Good faith" does not include the defendant's belief or faith that the venture will eventually meet his or her expectations.
 Stull, 743 F.2d at 445 n. 6.
 
 
 [9]
 The remainder of the tape consisted mainly of reassuring statements made by Pohl to the effect that Investas would eventually become a successful company
 
 
 [10]
 There may, in fact, be no conflict at all. It is entirely possible that Bolan-Belmont received her Form 1099 in the mail, and then was given another copy by Schulte